**Leonard L. BURSTEN, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 23725.**

United States Court of Appeals
Fifth Circuit.

May 27, 1968.

Richard Booth, Miami, Fla., Virgil M. Wheeler, Jr., New Orleans, La., Walters, Moore & Costanzo, Miami, Fla., and Sehrt, Boyle & Wheeler, New Orleans, La., for appellant.

Mitchell Rogovin, Asst. Atty. Gen., Joseph M. Howard, John M. Brant, Attys., Dept. of Justice, Washington, D. C., James O. Murphy, Jr., Asst. U. S. Atty., Miami, Fla., for appellee.

Before COLEMAN and SIMPSON, Circuit Judges, and DAWKINS, District Judge.

BEN C. DAWKINS, Jr., District Judge:

This appeal is from a conviction for willful income tax evasion. 26 U.S.C. § 7201.[1] For the reasons hereinafter indicated, we reverse and remand for a new trial.

Appellant, Bursten, a non-Florida lawyer, but who engaged in legal and financial activities there, and was ap-

---

1. 26 U.S.C. § 7201. Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both, together with the costs of the prosecution.

parently quite a "wheeler-and-dealer," was indicted for evading federal income taxes for 1957. Specifically, the indictment charged him with reporting he had no taxable income in 1957, when in fact he knew that his income for that year was $152,767.14. Income tax which would have been due on this amount would have been $93,093.40.

After a one-week trial, defendant was found guilty as charged. He was sentenced to eighteen months (fifteen months of which was suspended) and fined $5,000. In this appeal Bursten complains of various errors, said to have been committed by the trial court, which will be discussed hereinafter.

Appellant's financial transactions, as detailed in the record, were somewhat complicated. Consequently, we set forth here only the salient facts necessary for clear understanding of the case.

A. *The Kadison Corporation.* In 1950, three people, appellant, Walter Sawyer (his uncle), and Milton Kadison formed the Kadison Corporation. Each party owned a one-third interest in the stock of that company. Bursten performed necessary legal work for organizing and operating the corporation and also secured its financing. The bulk of its capital was obtained through a $7,000 bank loan upon endorsements of appellant and Sawyer; and also through loans totaling $88,000 from Sawyer's Downtown Motors, a corporation owned by Sawyer. Initially, the purpose of Kadison Corporation was to engage in manufacturing products for the Korean War effort. It was planned that ultimately Kadison was to go into manufacturing non-defense materials. To this end, Kadison secured a contract from the Navy for manufacture of a five-inch rocket motor igniter ring. Profits expected to materialize from this contract did not accrue and the corporation soon went into receivership.

Subsequently, during 1952, 1953, and 1954, Bursten claimed various losses in connection with Kadison's failure. During those years the Internal Revenue Service allowed appellant various amounts of actual losses. After filing his 1954 income tax return, he was left with $5,084.40 in losses which could be deducted in future years.

B. *The East Corporation.* In 1950, East Corporation was formed to take title to Bon-Air Apartment Buildings, then under construction. Appellant and his wife, Lucile Bursten, held 16 of the 80 shares of stock issued by this corporation, for which appellant paid the nominal sum of $300.00. Sawyer was also a stockholder therein, as well as other persons whose interests are not pertinent to this prosecution. In 1951 appellant borrowed some $10,000 from Sawyer and gave a note secured by pledge of the 16 shares of East Corporation stock owned by appellant and his wife to Sawyer as collateral for the loan. When the note was not paid timely, Sawyer had these 16 shares transferred to his [Sawyer's] name on the books of the corporation.

C. *The Boca Ciega Land Contract.* January 25, 1955, appellant entered into a contract with Hyman Green, of Irving Green & Associates, whereby the Greens were to purchase certain tracts of land in Florida and appellant was to perform legal services connected with development of that real estate. Both parties were entitled to a fifty per cent interest in the land to be acquired, contingent upon repayment of all funds advanced by the Greens. (Government Exhibit No. 1). August 26, 1957, appellant assigned all of his interest in this contract to the Greens for $160,000.

D. *The 1957 Tax Return.* May 9, 1960, I.R.S. received an income tax return from appellant marked "Amended" [1957] Return. This return was dated November, 1959. The Service had no record of any prior return from him for the year 1957.

In filing this return, appellant reported a capital gain of $156,000 ($160,-000 less certain sales expenses) on disposition of his interest in the Boca Ciega Land Contract. As an offset against this gain he claimed a carry-over capital

loss of $140,000, described in the following manner (Government Exhibit No. 8):

"Carry-over Loss from previous returns of Kadison Corp. Loss, which was determined in Internal Revenue Service audit of 1959 to be a Capital Loss—Fair market value of property in excess of $140,000."

Appellant also claimed a $14,000 "loss"[2] on his 1957 return resulting from his legal practice. Thus he reported no taxable income on his return for 1957.

Upon receipt of this 1957 income tax return, I.R.S. conducted a thorough investigation in an attempt to find the basis for the $140,000 capital loss. When their investigation failed to substantiate appellant's claim of that loss, this prosecution ensued.

At trial, the Government offered testimony from Special Agent George Vilas which tended to show that his investigation of the $140,000 loss revealed that this loss could not be substantiated in any manner. Moreover, the Government presented the testimony of Michael Zier, who was accepted as an expert in the field of income tax declarations. Zier reiterated the Government's contention that there was no basis for the $140,000 loss carry-over. He also testified that, under the law and regulations, the $160,-000 treated as capital gain from the Boca Ciega Land Contract should have been treated as ordinary income instead of capital gain. He based his analysis on the fact appellant received these monies for *legal services* performed by him in consummation of that land contract. Zier concluded that a complete analysis of appellant's return showed that he should have reported a net income of $145,497.-96. The tax due on this amount would have been $87,871.85. *En passant*, we must note that Zier's computations were not in exact accord with the charges in the indictment, although they were not materially different.

Bursten defended by seeking to show that the $160,000 reported as capital gain resulted from his alienation of an interest in immovable property. When questioned about the $140,000 capital loss carry-over, Bursten attempted to explain that loss in the following manner:

He asserted that the $140,000 loss claimed for 1957 was not actually a carry-over loss from Kadison Corporation. Instead he testified that in 1957 his wife threatened to sue both him and Sawyer for the sixteen shares of stock which had been transferred to Sawyer as a result of his prior loan to appellant. In order to pay his wife for her stock, appellant transferred to her a two-thirds interest in certain Florida real estate which he had acquired. Further testimony revealed that appellant acquired this property from one Wells, after assuming the debt Wells owed upon it. Bursten then testified that he borrowed money from two banks to pay off the indebtedness on the property and thus acquired title thereto from the actual owners, whose names were Lightsey. He testified that he paid some $220,000 for this property and that a two-thirds interest therein, which he transferred to his wife, would have a value of approximately $140,000. According to appellant, this was the basis of the capital loss carry-over which he reported on his 1957 tax return.

Bursten further stated that he claimed this loss in 1957 because he was specifically advised to do so by his tax counsel, William J. Goldworn. Goldworn, accepted by the Court as an expert in income tax matters, testified that he had represented both Mr. and Mrs. Bursten in their tax affairs through 1957, and in some instances thereafter. He further declared that Mrs. Bursten initially came to him because she was unhappy with what had happened to the East Corporation stock.

Concerning the 1957 return, Goldworn testified that Bursten brought to him several contracts dealing with his vari-

---

2. While on the witness stand, appellant testified that the $14,000 claimed as a loss on his 1957 income tax return, was actually an "expense." (Tr. 641)

ous land transactions. They then discussed the propriety of appellant's reporting certain of these transactions as gains and losses on his 1957 income tax return. Goldworn said that, since the purchase price of the land from the Lightseys was $220,000, and "since his [Bursten's] wife had a two-thirds interest in it which had been—he had purchased certain stock from her for that interest—then the value of the stock would be what he [Bursten] paid her for it if it was an arm's length transaction and that, therefore, two-thirds of $220,000 was approximately $140,000." (Tr. 676) Goldworn then stated that, in his opinion, the transaction *was* indeed an arm's length transaction.

The Government countered by asking Goldworn whether he knew such losses were not deductible under Section 267 of the Internal Revenue Code of 1954. Goldworn replied that in his opinion such an "arm's length transaction" as the one he had described was not within the reach of Section 267.

As noted, at the close of the evidence and after the jury was charged by the Court as to the law, appellant was convicted of willful evasion of income tax due in 1957. We now proceed to consideration of the specific issues presented by this appeal. While appellant has set forth a nine-point argument in brief, we find it necessary to rule upon only three of these, which are definitely dispositive of the appeal.[3]

I.

■ The first question presented is whether this prosecution was barred by the expiration of the applicable six-year statute of limitations (IRC of 1954, § 6531). In this and the following remarks, we naturally intimate no opinion as to appellant's guilt or innocence.

Appellant's 1957 tax return, actually due April 15, 1958, due to extensions granted for filing time, was not submitted until May 9, 1960. The indictment was returned October 12, 1965, some five years and five months after the *filing* of the 1957 return. Since the applicable period of limitation under Section 6531, as interpreted by appellant, would have run from the initial due date for the filing of the return, prosecution would be barred if the statute began to run when the return became due; but it would have been timely instituted if the statute ran only from the date the return was filed.

In Hull v. United States, 356 F.2d 919 (5 Cir. 1966), we held that the statute began running from the date the return was due. Appellant contends that our decision in *Hull* is controlling and, therefore, that institution of prosecution in this case has come too late.

When the case was argued, United States v. Habig, D.C., 270 F.Supp. 929, was pending in the Supreme Court. The Limitations issue presented in that case was identical to this one, and we, therefore, withheld judgment on this case until the Supreme Court acted definitively.

Habig was indicted August 12, 1966. The income tax returns involved there were filed August 12 and 15, 1960. Habig contended that the critical date was not when the returns actually were filed, but that when they were due to be filed.

■ In a thoroughly documented opinion which traces the full legislative history of I.R.C. Sections 6513 and 6531, the Supreme Court, in a unanimous opinion written by Mr. Justice Fortas, and in effect overruling *Hull*, held that where the return was filed *after* the due date, the Statute of Limitations did not begin to run until the *date of filing*. (That is the date when the alleged crime was committed.) The Court said that when the return is filed *prior* to the due date, the statute begins to run on the due date. United States v. Habig, 390 U.S. 222, 88 S.Ct 926, 19 L.Ed.2d 1055, decided March 5, 1968, (mandate issued April 1, 1968). The decision in *Habig* is now binding upon us and therefore appellant's argument that this action was instituted too late has no merit.

3. We seriously doubt whether there is any validity to these other arguments by appellant.

## II.

Appellant further contends that the trial judge committed reversible error in refusing to give to the jury the following specially requested instruction:

"If you find that the defendant had discussed this matter with competent tax counsel and that the tax return herein was prepared pursuant to that advice, then you must find that the defendant did not willfully file a false return or make a false statement, and you should bring in a verdict of not guilty." (Tr. 859)

We agree that there is substantial merit in this contention for the following reasons:

In Perez v. United States, 297 F.2d 12 (5 Cir. 1961), we held:

"It is elementary law that the defendant in a criminal case is entitled to have presented instructions relating to a theory of defense for which there is any foundation in the evidence. * * * A charge is erroneous which ignores a claimed defense with such a foundation. * * * The charge to which he is entitled, upon proper request, in such circumstances is one which precisely and specifically, rather than merely generally or abstractly, points to his theory of defense, * * * and one which does not unduly emphasize the theory of the prosecution, thereby de-emphasizing proportionally the defendant's theory." (Citations omitted) (297 F.2d at 12, 15, 16)

Our recent ruling in Strauss v. United States, 376 F.2d 416 (5 Cir. 1967) also involved an appeal from a conviction of willful tax evasion. Coincidentally, that case also was tried before the same District Court in Florida. In reversing the conviction and sentence for failure of the Trial Court properly to instruct the jury, we noted:

"* * * If the trial judge evaluates or screens the evidence supporting a proposed defense, and upon such evaluation declines to charge on that defense, he dilutes the defendant's jury trial by removing the issue from the jury's consideration. In effect, the trial judge directs a verdict on that issue against the defendant. This is impermissible. Bryan v. United States, 5 Cir. 1967, 373 F.2d 403." (376 F.2d 416, 419)

Review of the record here leaves little or no doubt as to why appellant requested the quoted instruction. One of the essential elements to be proved by the Government here was that he, appellant, *willfully* evaded the federal income tax laws. To have been successful, the Government must have proved, beyond a reasonable doubt, that appellant willfully filed a false income tax return with intent to defraud the Government. Thus, if the jury believed that appellant honestly relied on the advice of his tax counsel, Goldworn, it might have found that the element of willfulness was lacking and have acquitted. Moreover, there is no doubt that there was adequate basis in the record for this requested instruction.

Careful review of this quite lengthy record reveals why this instruction was refused by the District Judge:

"Mr. Booth: Which one are you refusing?

The Court: *Well, that 'advice'; that's no excuse at all for a lawyer, particularly. It's no excuse at all.* (Emphasis added.)

[We must note here, as a matter of judicial knowledge, that most lawyers have only scant knowledge of the tax laws.]

Mr. Osman: I give this to the Court and ask him if he is going to have a charge on that?

The Court: If this were the law, then I could get advice from anybody.

Mr. Soltz: Well, it says, 'competent'.

The Court: Well, that's silly. You can always find a crook that will give you any advice that you don't owe any tax."

(Tr. 725, 726)

Moreover, we note from the Charge Conference, this:

"Mr. Booth: Your Honor, it certainly goes on the question of what the intent was from what he was advised and what he believed.

The Court: Well, I'm not saying intent—

Mr. Booth: Whether it's the law or not.

The Court: That's a matter of argument. I agree with you that he may have been foolish enough to believe that so-called professor we had here —

Mr. Booth: He teaches at the graduate school.

The Court: I don't care what school he teaches in, *he is not a good tax man.* (Emphasis added)

Mr. Booth: Well, on the question of intent, that really doesn't make much difference.

The Court: No, he may have given that advice. I don't say he didn't; and if he did, I don't say that this man is guilty in this case if he believed him.

Mr. Booth: That's what the testimony shows.

The Court: That's up to the jury. I'm not going to decide that."

(Tr. 729, 730)

This clearly establishes that this instruction was refused because the trial judge thought "he [Goldworn] [was] not a good tax man." In the very same colloquy with defense counsel, the trial judge also noted that whether appellant relied upon advice given by Goldworn was up to the jury. As was stated in Strauss v. United States, supra:

" * * * We agree that the substance (though not necessarily the wording) of these charges should have been given. Defendant's dissatisfaction here

is not pettifoggery over nuances of words. His objections go to the refusal to submit substantive defenses." (376 F.2d 416, 418–419)

While the record reveals (Tr. 795–798) that the trial judge gave a *general* instruction to the jury on the element of intent, the authorities cited and quoted from conclusively hold that appellant was entitled to a more specific charge in light of his contention that he relied on advice of his tax counsel. This failure to give such a specific charge, even though it should have been reworded, so as to indicate that, to rely on this defense, appellant should have been found to have given *all* the facts to his advisor, was reversible error.

### III.

Finally, we consider appellant's last major contention that on many, many occasions the trial judge over-stepped the bounds of judicial propriety by repeatedly injecting himself into the trial, in questioning of witnesses and wrongly expressing his personal opinions. The thrust of this contention is that he (the judge) intervened to such an extent (on an average of at least once in each three pages of the Transcript) that appellant was denied the right to a fair trial guaranteed to him by the Constitution. In considering this contention, we advert to the following basic principles.

██ It is well settled that a federal district judge is not relegated to complete silence and inaction during the course of a criminal jury trial.[4] He must, however, be most careful that his interventions are proper, timely, made in a fair effort to clear unanswered issues, and are not prejudicial to defendant. Many federal decisions recognize the power of the judge, within reasonable limits, to comment on the evidence and to express fair opinions.[5] This privilege, however, has been limited to the point where the trial judge is under a strict

---

4. Moody v. United States, 377 F.2d 175, 178, 179 (5 Cir. 1967), and citations therein; Baker v. United States, 357 F.2d 11, 14 (5 Cir. 1966).

5. Moody v. United States, supra; Baker v. United States, supra, and citations therein.

duty to direct the jury clearly that they are the sole judges of the facts and are not bound by the judge's questions or comments. Matters of fact unmistakably must be left to the jury.

■ It is well known, as a matter of judicial notice, that juries are highly sensitive to every utterance by the trial judge, the trial arbiter, and that some comments may be so highly prejudicial that even a strong admonition by the judge to the jury, that they are not bound by the judge's views, will not cure the error.[6]

■ To be sure, admonition of counsel in hotly contested cases, such as this one, sometimes becomes requisite, even essential. Cf. United States v. Sacher, 182 F.2d 416 (2d Cir. 1950). It is preferable, of course, that such corrections be made outside of hearing of the jury, but, for such conduct to constitute ground for reversal, it must appear that in some way the judge's conduct operated to deprive the defendant of his right to an impartial trial, such as to deprive him of effective assistance of counsel, or adversely influencing and prejudicing the jury.[7] If a trial court continually intervenes so as to unnerve defense counsel and *throw him off balance, in a supposedly fair trial, and causes him not to devote his best talents to the defense of his client, then this is ground for reversal, no matter what counsel's experience and equipoise may be.* Even if there is a basis for some criticism of overpartisanship, of defense counsel, this does not justify unwonted and unnecessary continuous interruption.[8] A trial judge must strive for total neutrality and complete circumspection, in the eyes and minds of the jury.

■ Upon careful scrutinization of the record here, *it is abundantly clear that the many and manifest interventions by the trial judge deprived appellant of a fair trial.* While it would be impracticable, if not impossible, for us to set forth all instances of undue interruptions, and a total taking over of the trial by the District Judge, the following examples clearly illustrate that he manifestly overstepped the bounds of judicial trial propriety in commenting upon the evidence and lengthily and partisanly interrogated witnesses in the presence of the jury.

During cross examination of Government's witness, Sawyer, the following colloquy took place:

> "By Mr. Booth [Defense counsel]: Have you ever threatened to put Mr. Bursten in jail?
>
> Mr. Murphy [Government counsel]: I will object, your Honor. Now, Mr. Booth knows better than that.
>
> Mr. Booth: That is perfectly proper, your Honor.
>
> The Court: If he [Mr. Booth] doesn't prove it, *I hope the jury will hold it against him,* because he shouldn't make that statement unless he has some proof." (Emphasis added)

(Tr. 209)

The following dialogue occurred upon cross examination of the same witness:

> "Mr. Booth: In the south corridor that goes right past this Courtroom?
>
> Mr. Sawyer: I am a little mixed up, I may have been in the other corridor. I was in this building. I don't know *which corridor.*
>
> Mr. Murphy: Your Honor, this is wide of the scope of the direct examination.
>
> The Court: Yes, Mr. Booth, now get back to your own case, *if you have a case.* [Emphasis added] Proceed.
>
> Mr. Booth: Your Honor, I am trying to lay a foundation for a statement he has made.
>
> The Court: I know. You're trying to lay a—well, we won't say what

6. *Moody v. United States, supra.*

7. Johnson v. United States, 356 F.2d 680, 683 (8 Cir. 1966), citing Zeboundi v.

United States, 226 F.2d 826 (5 Cir. 1955).

8. Young v. United States, 120 U.S.App. D.C., 312, 346 F.2d 793, 795 (1965).

it is. But never mind. *You are not going to do it that way, so forget about it.* [Emphasis added]

Mr. Booth: Now, when you were in this building, in this—

The Court: Now, none of that, none of his being here in the building.

Mr. Booth: Your Honor, I am only laying a predicate for impeachment.

The Court: Mr. Booth, *sit down* and let the other attorney take over *if you don't know how to cross examine this man.* [Emphasis added]

Now, proceed in the proper way. I am sure that you have had enough training to know.

Mr. Booth: Do you recall the date that you were here?

Mr. Booth: Your Honor, you have got me in a position here that—I'd like to address the Court.

The Court: I know you'd like to, *and you're not going to,* Mr. Booth. *Your tactics are not correct.* [Emphasis added]

Mr. Booth: In the absence of the jury, may I talk to your Honor?

The Court: No. You can at noon. Just keep going on. At noon I will hear your objections, *whatever they are.* [Emphasis added]

You want to ask this man if he did, on a specific date, in the presence of certain people, at a specific place, make a statement which is contrary to something that is already made, you may do so, but nothing more.

Mr. Booth: I am trying to.

The Court: Nothing more.

Mr. Booth: Believe me, that's what I'm trying to do.

The Court: I know. *You are doing it in a very awkward way. Let's do it the right way.* [Emphasis added]

Mr. Booth: I am trying to establish the day.

The Court: Now, ask him a question. *Sit down.* Please sit down. *Take over, counsel.* [Emphasis added]

Mr. Soltz: Your Honor, I can't figure out how to ask the question Mr. Booth is trying to get.

The Court. *You sit down if you can't ask the questions.* There is no use waiting—" [Emphasis added]

(Tr. 215–218)

These proceedings, which took place in the presence of the jury, are bound definitely to have prejudiced the jury and to have had a deleterious effect upon appellant's right to a fair trial. These admonitions, which indeed were definitely prejudicial, made by the trial judge clearly constituted plain, manifest error. Such definitely were not adequately corrected by the Court's charge to the jury (Tr. 787), that it should disregard all arguments between Court and counsel. Other instances of erroneous intervention and grossly improper conduct by the trial judge in this case are set forth in the Appendix to this opinion.

For the foregoing reasons, the judgment of the District Court, therefore, is reversed and the cause remanded for a new trial.

Reversed and remanded.

## APPENDIX

Hereinafter quoted are excerpts from this transcript which illustrate only a few of the improper interventions and prejudicial remarks by the trial judge. All of these occurred before the jury.

"Mr. Murphy [Government counsel]: Your Honor, what relevance does this have?

The Court: Not a bit in the world. Now, Mr. Booth [Defense counsel] is trying to testify.

Now, Mr. Booth, you will have to take the stand if you want to continue on that.

Keep in mind we are only concerned, Mr. Booth, with did this man pay his taxes. His quarrels with his uncle [Mr. Sawyer], *if there were any such quarrels,* is so remote as to not be important at all. [Emphasis added]

Mr. Booth: Your Honor, the only purpose—

The Court: His uncle hasn't testified to anything—never mind your purpose. Never mind your testimony. You will have to take the stand and take the witness off the stand.

(Tr. 220–221)

\*    \*    \*    \*    \*    \*

The Court: We are just going around in circles, now.

Mr. Booth: I hope to tie it all in later, your Honor.

The Court: *I do not think you can* and I do not want you to do it, until you show me some reasons for doing it. [Emphasis added.]

Mr. Booth: Well, I believe it will all be tied in with other testimony.

The Court: *I don't think so, Mr. Booth.* If you tie it up, you can call this witness back. But let me hear you tie it up first. I'm not going to let you ramble all over the picture concerning this family's relationship. *How can you tie something else up when the deed is done? It is either in the income tax claim or it isn't in there.* [Emphasis added.]

(Tr. 433–434)

\*    \*    \*    \*    \*    \*

The Court: There is no claim here that this man [the defendant] owns that stock or, if he did own it, that is another day and another place.

Mr. Booth: There is a claim that he thought he owned it.

The Court: *Well, he is a lawyer, now. Now, he ought to know whether he owns it or not,* Mr. Booth. [Emphasis added.]

(Tr. 440–441)

[We must note that a lawyer-defendant in an income tax evasion case is held to no higher duty of knowledge of the tax laws than any other defendant.]

\*    \*    \*    \*    \*    \*

Mr. Murphy: Your Honor, I can't see the relevancy of this to the issue of this law suit.

The Court: I can't either, Mr. Booth claims there is. We will hold him to it, *unless he shows us something.* [Emphasis added.]

(Tr. 446)

[A criminal defendant is under *no* duty to prove his innocence.]

\*    \*    \*    \*    \*    \*

Mr. Soltz [Defense counsel]: To your knowledge, was Leonard Bursten a partner in 1560 Construction Company?

Charles Bursten: Yes.

The Court: Sustained.
Now, you want me to take action? Leading, suggestive, calling for a conclusion in all the faults. *I'm afraid maybe you don't know the law of evidence. Perhaps you better turn this over to other counsel.* This is your witness. [Emphasis added.]

(Tr. 473)

\*    \*    \*    \*    \*    \*

Mr. Booth: What was the discussion as to his stock after 1951?

Mr. Rakita: It was always my impression and it was always—

The Court: Never mind your impression. *We are not interested.* [Emphasis added.]

Mr. Rakita: It was always my discussion that this stock was collateral for monies that had been advanced to him by Mr. Sawyer.

The Court: There was no question about that, but what about it?

The Witness: It was always my discussion—

The Court: Never mind your discussion. What was said? Who talked to you and what—

The Witness: In my conversation with Mr. Sawyer—

Mr. Murphy: I will object to what his conversations with Mr.—

The Court: Never mind your conversations. That wouldn't be competent either.

**986**

(Tr. 489–490)

\*   \*   \*   \*   \*   \*

Mr. Soltz: Mr. Zier says that they couldn't tell what the income was because he never told him what the income was.

Mr. Osman [Government counsel]: That was not the testimony.

The Court: Not the testimony of anybody. *Sit down, Counsel. I am afraid that you are way out of place.* Mr. Booth, I think you better take over. If you have something to ask this man, go ahead and do it. [Emphasis added.]

(Tr. 576)

\*   \*   \*   \*   \*   \*

The Court: These loans came from the corporation.

Defendant: My understanding was, if I might—

The Court: *I say actually they came from the corporation.*

The Witness: I understood, your Honor, they were being charged to him personally. The corporation was just his conduit.

The Court: You understood you got the loan from the corporation. They do not get in the 80% bracket.

Defendant: I didn't get any loans from the corporation.

The Court: The corporation did what you were talking about, according to the record here. There are notes made to that—[Emphasis added.]

\*   \*   \*   \*   \*   \*

The Court: Go ahead.

Mr. Booth: The loans apparently—

The Court: *Well, he had no business saying 80% bracket. A corporation never gets in the 80% bracket. It might get in the 18% bracket.* [Emphasis added.]

(Tr. 589–590)

\*   \*   \*   \*   \*   \*

The Court: Let me say a corporation is not entitled to give rent-free apartments to anybody except on the basis of debt.

Mr. Booth: I am not arguing what the law is.

The Court: You asked him how come.

Mr. Booth: I agree. All I want is the facts.

The Court: Did you return income tax on that apartment for all those years?

Defendant: Did I pay income tax on those years? I don't recall.

The Court: *Look at your reports. I am sure you did not. I don't believe you did.* [Emphasis added.]

Mr. Booth: I don't believe that is material.

The Court: *It would be. If it was a rent-free apartment I think you would have to agree that he must report the value of the rent.* [Emphasis added.]

Mr. Booth: That may be true, but I don't think it has anything to do with this case.

The Court: I do not think any of this has anything to do with this case as far as that is concerned, but that is neither here nor there. Trying to get you to get to the case. Go ahead.

(Tr. 603–604)

\*   \*   \*   \*   \*   \*

The Court: Sustained. Sustained. What difference does it make?

Mr. Booth: I think it makes a difference.

The Court: *Well, I know. I do not think so* and please do not. *I don't think you think so, Mr. Booth, if you want a frank statement from this Court.* [Emphasis added.]

(Tr. 621)

\*   \*   \*   \*   \*   \*

The Court: When you settled with your wife?

Defendant: When I settled with my wife.

The Court: You know the law—

Defendant: I was advised—

The Court:—It is what you put in originally, not what you put in, your wife's.

Defendant: To determine my base and that's why I made my return accordingly.

The Court: *You took the advice of somebody that turned out to be wrong.* [Emphasis added.]

Defendant: I don't know if it is wrong. That's why we are here today.

The Court: You didn't know it was wrong?

Defendant: No, my counsel tells me it's not wrong.

The Court: All right.

Mr. Murphy: No further questions.

The Court: *Well, let me say to you that the law is that you only have a gain or loss is the difference between what you put in and what you take out.* [Emphasis added.]

(Tr. 658–659)

\* \* \* \* \* \*

The Court: You *knew* advances by way of loans is not a business expense. You certainly must have known that.

Defendant: Well, your Honor—

The Court: *Oh, well, never mind. Don't answer.* [Emphasis added.]

(Tr. 662)

\* \* \* \* \* \*

Mr. Booth: What his reputation is, if you know.

Mr. Ratner [Defendant's character witness]: I haven't heard any bad words.

The Court: *I haven't heard any bad things about Joe Doakes in New York City, but that doesn't make any difference.* [Emphasis added.]

Mr. Ratner: Mr. Bursten.

(Tr. 667)

\* \* \* \* \* \*

Mr. Soltz: Your Honor, I'm sorry, when I qualified him [Mr. Gold-worn] I forgot to submit him as an expert.

The Court: I will accept him as an expert, but—

Mr. Goldworn: Thank you.

The Court: *But I don't take expert opinions as to my job.*

Mr. Soltz: Well, that I understand.

The Court: *When they get appointed by the President then they become a different kind of expert, see.* [Emphasis added.]

(Tr. 685)

\* \* \* \* \* \*

The Court: Read this section now and see if you still persist in that opinion.

Mr. Goldworn: Read it out loud?

The Court: No. Just read it to yourself.

Mr. Booth: I object as it being an immaterial question, also, your Honor.

The Court: Well, he's an expert, and experts can be examined in great detail. *Let's see how good an expert he is, really."* [Emphasis added.]

(Tr. 687)

SIMPSON, Circuit Judge (concurring specially):

I concur in the result, on the basis of the matters discussed in Part III of the opinion, even though a number of the prejudicial remarks of the trial court were elicited by the conduct of defense counsel.

I disagree with Part II of the opinion. The requested instruction was deficient in at least two respects: (1) it speaks in terms of the defendant discussing the matter with tax counsel, rather than in terms of a full disclosure to such counsel, and (2) the necessary element of reliance upon counsel's advice is omitted. Under these circumstances, I am not persuaded that it was error to refuse the charge or to fail to edit it and give it in amended form.