**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Donovan WORKMAN, Defendant-
Appellant.**

**No. 26500.**

United States Court of Appeals,
Ninth Circuit.

Jan. 24, 1972.

Rehearing and Rehearing En Banc
Denied March 20, 1972.

Choy, Circuit Judge, concurred in the result and Browning, Circuit Judge, filed a dissenting opinion.

lice officer, and one year on the charge of destruction of Government property, the second sentence to run consecutively to the first. The defendant appealed. This court has jurisdiction of the appeal by virtue of § 1291 of 28 U.S.Code.

The brief on appeal filed by the counsel who had represented the defendant at the trial contained the following "Specifications of Errors".

1. The Court erred in denying appellant's motion for a mistrial.

2. The Court erred in that it abused the Court's privilege of comment in remarks pertaining to appellant's witnesses, Jan Peterson and Michael Rosen.

3. The Court erred in imposing sentences of five years and one year to run consecutively, as, under the facts and circumstances of the case, such sentence constituted cruel and unusual punishment.

Lee A. Halley (argued), Seattle, Wash., Ronald J. Meltzer, of Koenigsberg, Brown, Sinsheimer, Seattle, Wash., for defendant-appellant.

Charles W. Billinghurst, Asst. U. S. Atty. (argued), Stan Pitkin, U. S. Atty., Tacoma, Wash., for plaintiff-appellee.

Before MADDEN, Judge of the United States Court of Claims,* BROWNING and CHOY, Circuit Judges.

J. WARREN MADDEN, Judge:

Workman, hereinafter called the defendant, or the appellant, was charged, in an indictment, with assaulting a police officer, in violation of 18 U.S.Code § 113(c), and in an information, with destruction of United States Government property in violation of 18 U.S.Code § 1361. The two charges were consolidated, for trial by jury, which trial took place on May 5 and 6, 1970, in the United States District Court for the Western District of Washington. The jury found the defendant guilty on each of the two charges described above, and the court sentenced him to imprisonment for five years on the charge of assaulting a po-

■ With regard to the first specification of error, the trial court's denial of the defendant's motion for a mistrial, it can only be said that the controversy constituted a "tempest in a teapot". A witness for the prosecution, a policeman, Pillon, was being examined by the prosecutor as to actions of the defendant, of which actions Pillon was testifying as an eye-witness. He testified that he saw the defendant in the crowd at the front of the federal court-house, that the defendant was wielding a chain, which the defendant "swung over his head and he swung at the heads of two other persons that I saw." Counsel for defendant said "Objection, move to strike." Asked by the court to explain the objections, counsel said "Talking about other incidents, your Honor". The court then said, "I don't think we should go into other incidents. Next question". The next question by the prosecuting attorney was, "Officer, do you know who the other persons were that he swung the chain at?" The asking of that question apparently seemed to defense coun-

* J. Warren Madden, Senior Judge of the United States Court of Claims, sitting by designation.

sel to be the last straw, and he felt obliged to move for a mistrial. The court denied the motion for a mistrial, but admonished the jury to give no weight to the statement about the defendant's swinging the chain at people other than the policeman Grayson named in the indictment as having been the victim of the defendant's assault. When the examination of the witness was resumed, the witness, to "clarify" his prior testimony, explained, in effect, that when he testified that he had seen the defendant swinging the chain over his head he meant the defendant's own head, and when he spoke of the defendant having swung the chain over the heads of other persons, the other persons were Officer Grayson and another officer standing close to him. So the extensive learning about "other crimes" as circumstantial evidence of guilt of the crime charged was not in the case at all.

One might suppose that the misunderstanding, which gave rise to the motion for a mistrial having been cleared up, within minutes after it occurred, it would not be heard of again in this litigation. But, to the extent of several pages in the appellant's first brief, the dead issue is again belaboured. I can regard this only as an imposition upon the court and the parties.

██ The defendant's second specification of error is given the following heading: "The trial court committed prejudicial error in making remarks about appellant's witnesses that would tend to disparage them in the eyes of the jury." In elaborating this subject counsel says "At the trial of this cause appellant called two witnesses who observed the chain-swinging incident during the demonstration. These witnesses were Michael Rosen and Jan Peterson, both attorneys, and both staff members of the American Civil Liberties Union". (A.C.L.U.) It should be said that the testimony of these two witnesses was relatively unimportant. The fact that these two professional men were willing to be put on the witness stand as wit-

nesses for the defense would have given an air of respectability to the defense's side of the case, would have been of some help to the defense. But the difficulty was that they did not know anything about the relevant facts. Those relevant facts were, principally, how near to the face of the potential victim of the swinging hook at the end of the chain was the hook; was it six inches, one foot, two feet? What was the expression on the face, and the nature of the motions of the swinger of the chain? What was the expression on the face of Officer Grayson, near whose face the hook was swung, and what was the nature of his backward movements, while the defendant was moving toward him? What, if anything, was said by the defendant or by anyone else during the few seconds of action? As to these matters the two lawyer witnesses knew nothing. They were some 350 feet away from the action, and, of course, readily admitted that they knew nothing about these vital facts. So far, then, as any remarks of the judge might have caused the jury to discount the testimony of these lawyer witnesses, the witnesses had already frankly admitted the insignificance of their testimony.

I think it was not improper for the trial court to bring out, by questions addressed to the two lawyer witnesses, why they were at the scene of the demonstration, as observers, and in the performance of their duty as A.C.L.U. staff lawyers. The members of the demonstration were potential clients, with regard to bail, if needed, and with regard to a defense at their trials if their cases were rationally defensible. If a lawyer is an observer of an event in which his potential client is a participant, about which event there may, as he knows, later be a trial, and in the trial, as he has it from our highest authority, his duty will be to be completely partisan on the side of his client, it would not be "wonderful" as Chief Justice Marshall might have quaintly expressed it, if some of that one-sidedness might affect his vision of the act which he has observed.

But there is more to the appellant's claim that the trial judge conducted himself improperly with regard to the two lawyer witnesses, Rosen and Peterson. It so happened that at the very time of the trial of Workman, on May 5, 1970, a demonstration was taking place at the front of the same court-house at which the events out of which Workman's trial arose, had taken place on February 17, 1970. An interesting difference of appraisal of the events of the day of the trial, May 5, 1970, is the following. In the brief of plaintiff's trial counsel, that occurrence is spoken of as "(which parenthetically had nothing whatsoever to do with this trial, and was a peaceful demonstration)". On the other hand, the defendant's supplemental brief says: " * * * because the record makes clear that the outside demonstrations, affecting the excitement and fear at the court-house, and calling into play the overabundance of the riot-gear Tactical Squad police and judicial inflammation to the jurors * * * " ·

Whatever was going on outside the court-house did not, apparently, interfere with the testimony of Rosen and Peterson. At the close of Peterson's testimony the court addressed some remarks to the jury, referring to the then active demonstrators as cheerleaders. We see nothing wrong with that. The court further said:

> "I think I am not going to take a recess at this time. I hear the cheerleaders out in front. We will continue on a little while. At least I assume that is what I hear but don't let it bother you.
>
> I don't know whether it is the right thing to say but someone once said brave men die only once and a coward a thousand times, so that I guess we might as well be brave and I take it most of you have lived a good, full life anyway so that what is the difference."

The foregoing judicial peroration may not have been Shakespearean, but I am not competent in that field. I think that it disclosed no more than that the judge did not approve of demonstrations at the court-house. I suppose that the jury would have been unanimous in agreeing with that. But that would not have affected their opinion of the violent incident which had occurred on February 17, 1970, and the question whether the defendant had a guilty part in it.

Immediately following the foregoing events, the witness Peterson asked the court, "May we be excused?" The court said "Yes, you may be excused. I think they are waiting for you". I think the court's expression was careless, rude and improper. It was the kind of expression which, if indulged in by a person of importance, will usually produce a laugh, from many of his audience and an embarrassed chuckle from some. It contained an implication that A.C.L.U. lawyers have nothing more useful to do than to participate in demonstrations. But I have no urge to abort this important and expensive judicial proceeding because one of the actors in it disclosed that he was, like the rest of us, not impeccable. As has already been said, the testimony of the witnesses who might have been discredited by the remark was unimportant, and the evidence of what happened on February 17, 1970, was overwhelming and, in effect, uncontradicted.

The appellant in his brief attacks the sentences imposed by the District Court, saying "The sentence imposed by the court constituted cruel and unusual punishment". The sentences were, 5 years, the statutory maximum on the assault conviction, and one year on the damage to Government property charge, also the statutory maximum for that offense, the one year sentence to be consecutive to the five year sentence. The appellant argues that these maximum sentences constituted, in the circumstances, an abuse of discretion on the part of the sentencing court. The fact that the sentencing occurred less than 24 hours after the jury verdict, and without a pre-sentence report, and that the trial court, in its remarks at the

time of sentencing, stressed the deterrent purpose of sentencing, are urged by the appellant to show that the court did not, or did not sufficiently consider the rehabilitative purpose of sentencing.

As to the absence of a pre-sentence report, the record shows that the other judge who had conducted pretrial hearings in the defendant's case had appointed a psychiatrist who had examined the defendant at length and had submitted his report to the court; that a psychiatric expert presented by the defendant at the trial testified at length concerning the defendant's history and was cross-examined by the prosecution; that a psychiatric expert testified for the prosecution, in rebuttal of the defendant's expert, and was cross-examined by the defendant; that the defendant was a witness in his own behalf, and was cross-examined by the prosecution. The defendant's lengthy testimony consisted largely of his personal history and conduct during several years preceding the events resulting in his trial. I think the trial judge had a much more complete exposure to the pertinent history of the defendant than he would have obtained from, for example, a probation officer's report.

The image of the defendant which the court might reasonably have received from the sources just mentioned, could have been that of a twenty-two year old man, endowed with a good deal of native intelligence, with a physique which had survived an almost incredible amount of self-inflicted physical abuse and was still in salvageable condition if a reasonable amount of order and system were imposed upon him; a man whose actual life had, for several years, been worse than worthless to himself and to society, who had, as he testified, made his living by, among other things "doing some rip-off and things like that, trying to scrounge the best I know, scrounging, begging, selling a fix." His testimony, as I read it, is an inarticulate plea for help from a man who is not devoid of sensitivity, a recognition that the freedom which society had accorded

him had, under his management, made of him a pitiable public nuisance; that he was approaching the last stop, and he was afraid. The trial court may well have concluded that what this man needed was not a slap on the wrist and then some more freedom, but a substantial period of orderly life in which he could not, without extraordinary skill, resume his former practice of self-destruction. The trial court's experiment in sentencing may not work out successfully. There have been many failures in this vital field in which so many dedicated persons have worked, and such astronomic sums of money have been spent. But no outcome could be worse than the life of "rip-off * * * scrounging, begging, selling a fix", the apparent alternative.

■ My conclusion is that the sentence imposed by the trial court did not constitute cruel and unusual punishment, nor was it otherwise erroneous.

Trial counsel for the defendant submitted a list of 30 questions, and a request that these questions should be addressed by the court, to prospective jurors on voir dire. During the voir dire by the court, there was discussion between the court and defense counsel. Some of the requested questions were asked, more were refused. Trial counsel in this appeal makes no mention of the problem of the requested questions. But new counsel, who filed a supplemental brief for the defendant in this appeal, complains about the unasked questions. He says that no questions "were elicited concerning attitude toward drug users, white revolutionaries, demonstrators, law and order, crime and violence, the Seattle Liberty Front, the war in Southeast Asia, or any matter that 'unconsciously fights detachment from the mental processes of the average man'". The foregoing quote within a quote is from the opinion in Irvin v. Dowd, 366 U.S. 717, 727, 81 S.Ct. 1639, 6 L.Ed.2d 751. I think that an intensive questioning of each prospective juror upon the subjects named above would have consumed an inordinate amount of time,

would have confused the jurors as to what issues were relevant to the case upon which they were about to deliberate, and would not have produced any significant information about the suitability of the prospective jurors.

■ Defendant's supplemental brief says "The trial court's conduct toward defense counsel, in treatment of defense witnesses, in mentioning appellate procedures available, and in general comments was unfair". I have, earlier in this opinion adverted to the uncalled for remark which the judge made to the A.C. L.U. witness when the witness was leaving. I refer to that discussion. The only seriously questioned fact in the case was that treated by the expert psychiatric witnesses as to the mental capacity of the defendant to entertain a criminal intent. An examination of the court's dialogue with each of the expert witnesses shows an even-handed unbiased treatment of the witnesses. As to the treatment by the judge of the defendant's trial counsel, it is worth mentioning that that counsel, in his brief for the appellant, did not complain about his treatment by the court. And I see nothing in the record in that connection except the not unheard of phenomenon of a somewhat high-handed captious moderator of a trial, to whose conduct the practicing bar had developed an immunity.

■ Counsel speaks of the trial court's "mentioning appellate procedure" as prejudicial error, but says nothing further about that in his brief. The reference must be to a passing remark by the trial court, in explaining to a juror that the juror must accept the law as given to him by the court. Then the court said "If there is any error, why (sic) someone else can correct it". Surely the jurors could not have received the impression, from these brief words, that they need not consider their verdict carefully and responsibly because "someone else" would have the final word and the responsibility for the outcome of the trial. Compare People v. Morse (1964), 60 Cal.2d 631, 36 Cal. Rptr. 201, 388 P.2d 33.

I find no prejudicial error. The judgment appealed from is affirmed.

CHOY, Circuit Judge (concurring):

I concur in the result.

BROWNING, Circuit Judge (dissenting):

Appellant offered two defenses to the assault charge. The first was that appellant was under the influence of narcotics and unable to appreciate the wrongfulness of his conduct. The second was that appellant's actions were calculated to stop the officer from taking pictures rather than to injure him.

Appellant's opening witnesses were two staff attorneys of the American Civil Liberties Union who were present at the demonstration as observers. They were the only defense witnesses who saw the incident in question, except appellant himself. They testified in support of appellant's second defense to the assault charge.

In substance, their testimony was that appellant twirled the chain over his head and advanced slowly toward the officer, and the officer retreated at the same pace. When the officer backed off, appellant stopped, turned around, and walked away. Both testified that appellant made no sudden move toward the officer.

If the jury had credited this testimony it might well have acquitted appellant on the ground that there was reasonable doubt that bodily harm was either threatened or feared. Appellant's counsel so argued to the jury.

Thus the weight given the testimony of these two witnesses by the jury was critical to appellant's second defense to the assault charge. It is simply not true that the testimony of these witnesses "was relatively unimportant", or that the witnesses "did not know anything about the relevant facts"; or that they

"frankly admitted the insignificance of their testimony."[1]

The trial judge disparaged and belittled the two witnesses. The trial judge suggested that neither of the witnesses knew his proper professional title.[2] He cast doubt upon their explanation of their presence at the riotous demonstration ("Were you there just as an observer?"); and hinted that there was some impropriety in their announced purpose to arrange bail for those arrested ("No matter what the offense . . . ?"). The trial judge required one of the attorneys to swing the chain as he had seen appellant swing it; and, appearing to detect some hesitancy, chided the witness, "Are you afraid you will hurt yourself?"

Perhaps these comments and questions might be passed off as "instances which were of little importance in their setting," Glasser v. United States, 315 U.S. 60, 83, 62 S.Ct. 457, 471, 86 L.Ed. 680 (1942), and too easily magnified in the "ivory tower of appellate court chambers." Kohatsu v. United States, 351 F.2d 898, 904 n. 11 (9th Cir. 1965), quoting Bush v. United States, 267 F.2d 483, 488 (9th Cir. 1959).

But a more serious incident followed.

The charges arose out of appellant's participation in an anti-war demonstration at the United States Courthouse in Seattle, Washington, on February 17, 1970. Some 1500 to 2000 persons participated. Rocks were thrown, windows and doors broken, and other property damage inflicted. As the prosecuting attorney told the jury in the present case, the February 17 demonstration "developed into practically a riot at the doors of the courthouse building."

The invasion of Cambodia was announced April 30, 1970. On May 4, four students were killed during an anti-war demonstration at Kent State University in Ohio.

The trial of this case began on May 5. It was held in the United States courthouse that had been the scene of the February 17 demonstration. On the second day of the trial another anti-war demonstration began outside the courthouse. The noise made by the demonstrators intruded into the courtroom. As the second of the two attorney-witnesses completed his testimony, the court said:

"I think I am not going to take a recess at this time. I hear the cheerleaders out in front. We will continue on a little while. At least, I assume that is what I hear but don't let it bother you.

I don't know whether it is the right thing to say but someone once said brave men die only once and a coward a thousand times, so that I guess we might as well be brave and I take it most of you have lived a good full life anyway so that what is the difference."

The attorney-witness then asked, "May we be excused?"

---

1. They observed the event from across the street, and therefore could not see the facial expressions of the participants or hear what was said. But they had an unobstructed view of the entire incident. Their testimony as to the facts was unequivocal, and was not shaken by the prosecutor's cross-examination.

2. The relevant part of the reporter's transcript reads:

"Q. What is your occupation, Mr. Rosen?
A. Attorney.
THE COURT: What?
THE WITNESS: Attorney.
THE COURT: Attorney.

By Mr. Meltzer:
Q. Mr. Rosen, were you present—
THE COURT: (Interposing) Attorney at Law, you mean?
THE WITNESS: Yes, your Honor. (Tr. 150)

*      *      *      *      *

THE CLERK: State your full name, please.
THE WITNESS: Jan Eric Peterson.
By Mr. Meltzer:
Q. What is your occupation?
A. Attorney.
THE COURT: Attorney at what?
THE WITNESS: Attorney at Law, your Honor." (Tr. 162)

The court responded, "Yes, you may be excused. I think they are waiting for you."[3]

The inference was inescapable. The judge told the jury, in effect, that the two defense witnesses were associates of the persons who were then conducting a demonstration outside the courthouse involving a risk of harm to the jurors. The impact was heightened by the obvious parallel to the violent and destructive demonstration of February 17. The jury had just seen the earlier demonstration on videotape and had heard it described by witnesses.

No doubt the trial judge wished appellant to have a fair trial. The judge's statement appears to have been thoughtless. When defense counsel moved for a new trial, the judge denied having made the statement, telling defense counsel, "This is a figment of your imagination."

But the statement was made; and it could only have had a devastating effect upon the credibility of the two defense witnesses in the eyes of the jurors.

" 'The influence of the trial judge on the jury is necessarily and properly of great weight,' Starr v. United States, 153 U.S. 614, 626, 14 S.Ct. 919, 38 L.Ed. 841 and jurors are ever watchful of the words that fall from him. Particularly in a criminal trial, the judge's last word is likely to be the decisive word." Bollenbach v. United States, 326 U.S. 607, 612, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946). See also United States v. Tobin, 426 F.2d 1279, 1282 (7th Cir. 1970); United States v. Cassiagnol, 420 F.2d 868, 879 (4th Cir. 1970); United States v. Barbour, 137 U.S.App.D.C. 116, 420 F.2d 1319, 1322 (1969); Bursten v.

United States, 395 F.2d 976, 983 (5th Cir. 1968); Moody v. United States, 377 F.2d 175, 179 (5th Cir. 1967).

The trial was short, a day and a half. The defense offered only six witnesses, including appellant. The two ACLU attorneys were the defense's opening witnesses. They were critical to the contention that no assault had occurred. It was for the jury to evaluate their reliability and to accord their testimony such weight as the jury saw fit. Appellant was entitled to have the jury act free of the influence of the judge's dramatic pronouncement that effectively stripped the witnesses of any claim to credibility in the jury's eyes. Quercia v. United States, 289 U.S. 466, 470, 53 S.Ct. 698, 77 L.Ed. 1321 (1933); see also United States v. Chibbaro, 361 F.2d 365, 378–379 (3d Cir. 1966).

It is impossible to say, "with that degree of assurance required in a criminal case, that the activities of the trial judge may not have prejudiced the defendant, notwithstanding the strong evidence presented against him." Jackson v. United States, 117 U.S.App.D.C. 325, 329 F.2d 893, 894 (1964). See also Moody v. United States, supra, 377 F.2d at 179–180.[4]

Appellant is therefore entitled to a new trial.

A word regarding appellant's attack upon the sentence. The short and only answer is that the sentence is not subject to appellate review. The trial judge would be the first to reject the elaborate attempt to demonstrate some basis for the sentence in terms of appellant's

---

3. In moving for a new trial, defense counsel stated for the record that the judge's remark "was made in a sarcastic manner and cast aspersions."

4. In his instructions the judge said he had asked questions "for the sole purpose of bringing out facts which I thought might be of assistance to the jury,"

and admonished the jury "not to draw any inference from any questions or to assume that I hold any opinion on the matter to which my questions related."

However, by its terms, this general instruction relating to questions the judge may have asked was not relevant to the judge's comment regarding the two defense witnesses.

rehabilitation.[5]  The trial judge made it completely clear that the sentence was based upon a single overriding consideration—deterrence. "You may think this is a cruel sentence," the judge said, "but I am telling you that these people are going to have to come to task in this country and stop assaulting people."

5. Appellant was 22 years old. He had no prior felony conviction. The property destroyed was valued at $49.90. No one was injured in the assault. There was no presentence investigation. Appellant was given the maximum term under each statute, one year and five years, the sentences to run consecutively.