ACCEPTED
06-14-00115-CR
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
2/20/2015 3:11:13 PM
DEBBIE AUTREY
CLERK

NO. 06-14-00115-CR

IN THE COURT OF APPEALS
FOR THE SIXTH APPELLATE DISTRICT
AT TEXARKANA

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
2/20/2015 3:11:13 PM
DEBBIE AUTREY
Clerk

CORDERO BROWN

VS.

THE STATE OF TEXAS

APPEALED FROM THE 124TH DISTRICT COURT, GREGG COUNTY
TRIAL CAUSE NO. 42,258-B

**BRIEF FOR CORDERO BROWN, APPELLANT**

Hough-Lewis ("Lew") Dunn
Attorney at Law
201 E. Methvin, Suite 102
P.O. Box 2226
Longview, TX 75606
Tel. 903-757-6711
Fax 903-757-6712
Email: dunn@texramp.net

Appellant Respectfully Requests Oral Argument

## STATEMENT REGARDING PARTIES TO THIS APPEAL
### [RULE 38.1(a) TEX.R.APP. PROC.]

CORDERO BROWN
Appellant

Tim Cone
Attorney at Law
P.O. Box 413
Gilmer, TX 75644
Texas State Bar No. 04660350
Trial Counsel for Appellant

V. Christopher Botto
Texas State Bar No. 24064926
Christopher A. Parker
Texas State Bar No. 24046585
Assistant Criminal District Attorneys
101 E. Methvin, Suite 333
Longview, TX 75601
Trial Counsel for the State of Texas, Appellee

HOUGH-LEWIS ("LEW") DUNN
Attorney at Law
P.O. Box 2226
Longview, TX 75606
Counsel for Appellant on Appeal
Texas State Bar No. 06244600

ZAN COLSON BROWN
Texas State Bar No. 03205900
Assistant Criminal District Attorney
101 E. Methvin, Suite 333
Longview, TX 75601
Counsel for the State of Texas on Appeal

# TABLE OF CONTENTS

                                                                     PAGE

STATEMENT REGARDING PARTIES TO THIS APPEAL …..    ii

TABLE OF CONTENTS ……………………………………    iii

TABLE OF AUTHORITIES …………………………………    vi

ISSUES PRESENTED ……………………………………….    ix

STATEMENT OF FACTS ………………………………...    2

TRIAL ON THE MERITS…………………………………..    2

Opening Events ………………………………………..    2

State's Case-in-Chief ………………………………………..    2

    Jacob Muehlstein ……………………………………    2

    Jera Lynn Johnson ………………………………..    4

    Margaret Adkins ……………………………………    8

    Claire Alford ………………………………………..    9, 14

    Jeremy Simpson …………………………………….    11

    Megan Clark ……………………………………….    12

    Tara Roberts ……………………………………….    12

    Charles David Easterling …………………………..    12

    Lieutenant Kirk Haddix ……………………………    14

**TABLE OF CONTENTS (CONT'D)**

Chris Miller …………………………………………….. 20

Terry Mitchell …………………………………………….. 22

Jennifer Portman …………………………………………….. 26

Appellant's Case-in-Chief …………………………………………. 27

Sandra Brown ………………………………………….. 27

Appellant Cordero Brown ……………………………….. 29

Argument and Verdict: Guilt/Innocence ………………………. 32

Punishment Phase …………………………………………... 33

MOTION FOR NEW TRIAL ……………………………………. 36

SUMMARY OF THE ARGUMENT ………………………….. 36

ARGUMENT AND AUTHORITIES ………………………….. 36

FIRST ISSUE, RESTATED …………………………………... 36

THE TRIAL COURT ERRED IN REFUSING
*BATSON* CHALLENGES

SECOND ISSUE, RESTATED ………………………………… 44

THE EVIDENCE WAS LEGALLY INSUFFICIENT
TO CONVICT APPELLANT OF AGGRAVATED
ROBBERY

# TABLE OF CONTENTS (CONT'D)

PAGE

THIRD ISSUE, RESTATED …………………………………….. 47

    THE TRIAL COURT REVERSIBLY ERRED IN
    DENYING A REQUEST FOR A JURY INSTRUCTION
    ON ALIBI

FOURTH ISSUE, RESTATED …………………………………... 52

    THE TRIAL COURT REVERSIBLY ERRED IN ALLOWING
    INTO EVIDENCE A PHOTO OF APPELLANT WITH
    A GUN

FIFTH ISSUE, RESTATED …………………………………. 54

    THE TRIAL COURT REVERSIBLTY ERRED IN ALLOWING
    INTO EVIDENCE A 911 AUDIO THAT HAD NOT BEEN
    DISCLOSED TO APPELLENT PRIOR TO TRIAL

PRAYER FOR RELIEF …………………………………… 57

CERTIFICATE OF SERVICE …………………………… 58

CERTIFICATE OF COMPLIANCE ……………………… 58

# TABLE OF AUTHORITIES

CASES                                                                    PAGE

*Barshaw v. State*, 342 S.W.3d 91 (Tex. Crim. App. 2011) ………..    53

*Batson v. Kentucky*, 476 U.S.79 (1985) ……………………………    37, 43

*Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010) ………..    44

*Bryan v. United States*, 373 F.2d 403 (5th Cir. 1967) ………………    48

*Bursten v. United States*, 395 F.2d 976 (5th Cir. 1968) ……………    48, 49

*Davis v. Al*aska, 415 U.S. 308 (1974) ………………………………..    51

*Fox v. State*, 283 S.W.3d 85 …………………………………………    52, 53
    (Tex. App. – Houston [14th Dist.] 2009, pet. ref'd).

*Giesberg v. State*, 984 S.W.2d 245 (Tex. Crim. App. 1998) ………    48, 49

*Hernandez v. New York*, 500 U.S. 352 (1991) ………………………. 38

*Hooper v. State*, 214 S.W.3d 9 (Tex. Crim. App. 2007) ……………    44

*In re Winship*, 397 U.S. 358 (1970) …………………………………    44

*Jackson v. Virginia*, 443 U.S. 307 (1979) …………………………    44, 46

*Leadon v. State*, 332 S.W.3d 600 …………………………………….    42
    (Tex. App. – Houston [1st Dist.] 2010, no pet.)

*Malik v. State*, 953 S.W.2d 234 (Tex. Crim. App. 1997) …………..    45

*Oprean v. State*, 201 S.W.3d 724 (Tex. Crim. App. 2006) ………..    54

*Powers v. Ohio*, 499 U.S. 400 (1991) ………………………………    38

CASES (CONT'D)                                                    PAGE

*Snyder v. Louisiana*, 552 U.S. 472 (2008) ……………………………….    38, 39

*Strauss v. United States*, 376 F.2d 416 (5ᵗʰ Cir. 1967) …………….    48

*Sullivan v. Louisiana*, 508 U.S. 275 (1993) ……………………… 48, 49, 51

*Walker v. State,* 321 S.W.3d 18 ……………………………………….    55, 56
(Tex. App. – Houston [1ˢᵗ Dict.] 2009, pet. dism'd)

*Watkins v. State,* 245 S.W.3d 444 (Tex. Crim. App. 2008) …………    39

*Webb v. State,* 278 S.W.2d 158 (Tex. Crim.App. 1955) ……………    44

*Whitsey v. State*, 796 S.W.2d 707 (Tex. Crim. App. 1989) ……...    38, 40, 42

*Wilson v. State*, 536 S.W.2d 375 (Tex.Crim.App. 1976)……………    44

*Young v. State*, 283 S.W.3d 854 (Tex. Crim. App. 2009) …………..    38

STATUTES AND RULES

U.S. CONST.

   Second Amendment ………………………………………    53

   Fifth Amendment ………………………………………….    48, 49

   Sixth Amendment ………………………………………….    48, 49, 51

   Fourteenth Amendment ………………………………….    38, 44, 56

TEX. CONST.

   Art. 1, § 10 ………………………………………………    51

   Art. 1, § 19 ………………………………………………    44

STATUTES AND RULES (CONT'D)                                    PAGE

TEX. CODE CRIM. PRO.

     Art. 1.04 …… …………………………………………       44

     Art. 35.261 ………………………………………….       37

TEX. PENAL CODE

     § 6.03(a) and (b) …………………………………….       45

     § 29.02-29.03 ……………………………………….       45

TEX. R. APP. PRO.

     Rule 44.2(b) …………………………………..       53

     Rule 44.2(a) …………………………….…       51, 56

TEX. R. EVI.

     Rule 403 ……………………………………….       52

     Rule 404(b) ………………………………………       52, 53

OTHER SOURCES

     Whorf, Benjamin Lee. *Language, Thought, and Reality* ….   50, 51
        (M.I.T Press, 1956).

# ISSUES PRESENTED

FIRST ISSUE:

THE TRIAL COURT ERRED IN REFUSING *BATSON* CHALLENGES

SECOND ISSUE:

THE EVIDENCE WAS LEGALLY INSUFFICIENT TO CONVICT APPELLANT OF AGGRAVATED ROBBERY

THIRD ISSUE:

THE TRIAL COURT REVERSIBLY ERRED IN DENYING A REQUEST FOR A JURY INSTRUCTION ON ALIBI

FOURTH ISSUE:

THE TRIAL COURT REVERSIBLY ERRED IN ALLOWING INTO EVIDENCE A PHOTO OF APPELLANT WITH A GUN

FIFTH ISSUE:

THE TRIAL COURT REVERSIBLTY ERRED IN ALLOWING INTO EVIDENCE A 911 AUDIO THAT HAD NOT BEEN DISCLOSED TO APPELLENT PRIOR TO TRIAL

NO. 06-14-00115-CR

IN THE COURT OF APPEALS
FOR THE SIXTH APPELLATE DISTRICT
AT TEXARKANA

CORDERO BROWN

VS.

THE STATE OF TEXAS

APPEALED FROM THE 124TH DISTRICT COURT, GREGG COUNTY
TRIAL CAUSE NO. 42,258-B

**BRIEF FOR CORDERO BROWN, APPELLANT**

TO THE HONORABLE JUSTICES OF THE COURT OF APPEALS:

COMES NOW CORDERO BROWN, Appellant, on appeal in Cause No. 42,258-B, and the "Judgment of Conviction" of the District Court for the 124th Judicial District of Gregg County, Texas, wherein he was found guilty of the offense of aggravated robbery and sentenced to a term of sixty (60) years in the Texas Department of Criminal Justice, Institutional Division, the Honorable Alfonso Charles presiding at voir dire, and Honorable David Brabham presiding at the time of the jury trial and sentencing, in which Appellant was Defendant, and in which The State of Texas was plaintiff and is now Appellee.

1

**STATEMENT OF FACTS**

TRIAL ON THE MERITS

Opening Events

On June 25, 2014, the parties appeared before Hon. David Brabham (3 RR 9). The jury was brought in and sworn (3 RR 10). The trial court advised the jury about the course of events of the trial (3 RR 10-16). The indictment was then read, and Appellant entered a plea of "Not Guilty." (3 RR 16). Witnesses were then sworn and the Rule invoked (3 RR 17). Both sides gave opening statements (3 RR 19-24 – State; 3 RR 24-28 – Appellant).

State's Case-in-Chief

The State put on its case by calling the following witnesses: Jacob Muehlstein, Jera Lynn Johnson, Margaret Adkins, Claire Alford, Jeremy Simpson, Megan Clark, Tara Roberts, Charles David Easterling, Kirk Haddix, Chris Miller, Terry Mitchell, and Jennifer Portwood.

Jacob Muehlstein

Trooper Jacob Muelhstein worked for the Texas Dept. of Public Safety, and was on duty during the day shift on January 13, 2013 along with Trooper Ammons (3 RR 29-30). He received a call from dispatch that a neighbor reported a suspicious white van at the victim's house, and three men were carrying items from there to the

van; so Muehlstein drove to the location (3 RR 30-31). Referring to a call sheet, the witness stated that the call came in at 10:36 AM and he was dispatched at 10:40 AM (3 RR 32-33). When the arrived, they were met by the neighbor, and then they entered the house, announcing their presence and calling out for the owner; they saw what looked like evidence of a burglary with "stuff all over the floors" and the place "ransacked" (3 RR 34). After they checked throughout the house, they did not find the home owner (3 RR 34-35). Once they came into the garage, they heard a female voice there calling for help; they rescued her from the trunk of her car, finding her bound in duct tape (3 RR 35-36).

Next, the troopers took the victim into the house, seated her at the dining room table and got her a glass of water; EMS was called, and other law enforcement agents arrived at the scene, whereupon the investigation was turned over to the Gregg County Sheriff's office (3 RR 36). Without objection, State's Exhibit #1 was introduced into evidence – a video of the scene – and played for the jury (3 RR 37). These events occurred in Gregg County, Texas (3 RR 38).

On cross-examination, Trooper Muehlstein stated that it took less than five minutes to drive to the house from the place where he first received the call (3 RR 40). When he spoke to the victim, Mrs. Johnson, she told him that "it was three black males and possibly two males and a female entered her residence" (3 RR 42).

Jera Lynn Johnson

Mrs. Johnson testified that she was born and raised in Gregg County; since 1960 she had lived in her home at 6873 Judson Road; on January 14, 2013, she lived there by herself (3 RR 45). At about 10 AM she was doing her Bible study, when she heard a banging and doorbell ring at the front door, but she did not answer it (3 RR 46). Then a moment later they kicked in the back door of her house (3 RR 47). She came out of her bedroom and saw the intruders; she described them as two tall, slender men and one shorter one; one of them – without a mask or gloves on -- had a gun that he pointed at her (3 RR 48-49). He told her, "I'm going to kill you," pointed the gun at her temple, and grabbed her hair; then he took her down the hall, banging her head on the wall, and told her to sit in the chair (3 RR 49). The other two persons had masks on and perhaps gloves on, too (3 RR 50). The man with the gun was giving orders and the other two were taking things to the vehicle out the back door for about 30-35 minutes (3 RR 51). The man with the gun continued to hold Mrs. Johnson by her hair and asked her where her money and jewelry was; he struck her head on the door and on the walls, and was jerked and pushed (3 RR 52). The men took all of her jewelry that was in a jewelry armoire, depicted in State's Exhibits 2 and 3, pictures that were introduced without objection (3 RR 53-54).

The men took necklaces, rings, bracelets, a silver dollar necklace, three TVs and a 20 gauge shotgun (3 RR 54-55). At one point Mrs. Johnson could see the top

4

of a white vehicle (3 RR 56).

There was then a recess, and outside the presence of the jury counsel for Appellant objected to State's Exhibit #4, a photo of Mrs. Johnson and her dog, with the window in the background through which she saw the top of the van. The basis of the objection is that its probative value was greatly outweighed by its prejudicial, emotional impact; counsel believed that there were other pictures that would serve the same function but without the emotional impact of the victim and her dog; for record purposes Appellant proffered Defense Exhibits 1 and 2 (3 RR 59-61). State's counsel said that it had other pictures of the window and of the dog and that "I was just trying to save time." (3 RR 61). The trial court overruled the objection and admitted the exhibits (3 RR 61).

When evidence resumed, Ms. Johnson identified State's Exhibits 4 through 37 as her photos; they were admitted into evidence (3 RR 63).

Here are the contents of some of those exhibits:

No. 4: Mrs. Johnson and her dog, with the window through which she saw the white vehicle in her driveway (3 RR 64).

No. 10: her purse, from which the actors dumped the contents (3 RR 64)

No. 11: photo of her bathroom and sunroom, with footprints (3 RR 65)

No. 12: mother's gold bracelet, with initials VJ (her mother's) and date 11/26/32, the date of her parents wedding and 11/26/67, the 35th anniversary; it was stored in the

armoire (3 RR 66-67)

No. 13: her mother's cameo locket

No. 14: butterfly ring, wedding band, topaz bracelet, amethyst ring – most of that was Mrs. Johnson's (3 RR 67-68)

No. 20: Things that were left behind, such as three silver pieces, maybe 4 or 5, a brooch, perhaps a necklace, a ring or earring; these were the silver pieces left behind (3 RR 68-69)

No. 26: picture of the living room, where Mrs. Johnson was made to sit down (3 RR 69)

No. 29: French door kicked off its hinges (3 RR 70)

No. 25: view into hall coming out of her bedroom (3 RR 71)

No. 24: place where intruder banged Mrs. Johnson's head through a door(3 RR 71)

No. 33: her sunroom where the French doors are located (3 RR 71)

Mrs. Johnson thought that she would not "make it out" because she was threatened with being shot; she took the threat seriously; she gave her age as 77 years (3 RR 72). After the men had taken her property, they took her out into her garage, opened the trunk of the car, and told her to get in; they taped her mouth, head, and eyes, and also taped her hands and feet together (3 RR 72). Then the man with the gun shut the trunk and told her he would let her suffocate, saying, "I can't kill her" (3 RR 73).

6

Mrs. Johnson then told how she was able to get the trunk to open and began trying to get the duct tape off (3 RR 75). State's Exhibit 27 was then identified as a table on which there was a roll of duct tape used to bind her (3 RR 76). State's Exhibit 34 was a photo of her garage and the trunk of her car where she had been placed (3 RR 76). State's Exhibit 36 was a photo of the trunk of the car (3 RR 77). State's Exhibits 38 and 38A were then identified as her ring and a box that held it (3 RR 77). State's Exhibit 39 was identified as a bag and its contents; her pieces of jewelry, previously identified as an amethyst ring and butterfly brooch, seen in earlier exhibits (3 RR 78). Then State's Exhibits 40 and 40A were identified as an envelope and a small envelope plus contents (3 RR 79). It contained her mother's bracelet (previously identified) and a locket (3 RR 79-80). They belonged to Mrs. Johnson's jewelry collection (3 RR 80).

Asked to describe the men's clothing, Mrs. Johnson stated that they were wearing "a hoody type jacket…dark colored…dark gray" (3 RR 80).

On cross-examination Mrs. Johnson stated that the trooper got her out of the trunk of the car; she testified that she told a deputy that the incident began at 10:00 AM, and disagreed with Deputy Easterling's report that said she told him it began at 9:30 AM (3 RR 83-84). She did not recall telling him that there was knocking at her door at 9:30 AM (3 RR 84). She also disagreed with the report of Investigator Terry Mitchell, saying that she told him the time was 9:30 AM when she heard the loud

7

knocking (3 RR 84-85).

Then, asked whether she could identify Appellant as being one of the men who was there, she said, "I cannot definitely, no, sir." (3 RR 86). She also stated that she could not be sure of the sex (gender) of the other two persons present; she could not say whether they were men or women (3 RR 86-87). She stated that two of the people were tall and one was shorter, but could not say how much shorter (3 RR 88). The law enforcement agents took a DNA swab from her, but they did not take hair samples or fibers or her clothing that she had worn that morning (3 RR 91-92).

On re-direct examination Mrs. Johnson testified about the 1921 silver dollar; her father had a necklace made out of one from 1921, because that was the closest to her birth year; her former husband also had such a necklace made. She had two prior to January 14, 2013, but now one is missing (3 RR 93-94). Shown State's Exhibit 41 and 41A, Mrs. Johnson identified it as one of the necklaces (3 RR 94-95). The two men who were masked had dark gray or black ski masks on (3 RR 97).

<u>Margaret Adkins</u>

Ms. Adkins lived across the street from Mrs. Johnson on the date of the incident (3 RR 100). As she worked at her computer in her home, Ms. Adkins looked over to Mrs. Johnson's home and noticed a white minivan sitting in the driveway, and she saw people going back and forth from the house, several trips (3 RR 101). She called this to her husband's attention and called Mrs. Johnson, but no

8

one answered (3 RR 101-102). Then she saw three people run from the house, jump in the vehicle and take off; she called 911 to report this (3 RR 102). "It was morning, mid-morning, 10:00 o'clock, 10:00 to 11:00 area, somewhere around there" (3 RR 102). Looking at State's Exhibits 42 and 43, Ms. Adkins said it looked like a white minivan similar to the one she saw (3 RR 102-103). Those exhibits were admitted into evidence without objection (3 RR 103). That minivan had a rounded back, not one that was squared off (3 RR 103). When the three persons came out, they came out the front door of the house, got in the minivan, and drove away (3 RR 104-105). They were wearing hoodies of various colors: one was dark, the other two were fairly light; one of the men was shorter than the other two and they were "slender built" (3 RR 105). Ms. Adkins was unsure if one of them was a female, the short one (3 RR 105-106).

Almost immediately after the trio left, the witness and her husband drove to the house to check on things (3 RR 106). This took maybe five minutes and then 911 was called (3 RR 107).

On cross-examination Ms. Adkins agreed that she could not tell the race of the persons and that one of them could have been a girl – she just could not "tell for sure" (3 RR 109). She could not say that Appellant was one of the persons; she stated, "I could not identify any of the three" (3 RR 110).

Claire Alford

9

Ms. Alford owned and worked at the Gold Rush Mercantile and Trading Company for five years (3 RR 113-114). She identified Appellant, stating that he came into her store on January 14, 2013 (3 RR 114). Accompanied by two others named Reco and Lorenzo Chester (brothers), Appellant arrived at between 10:45 and 11:00 AM (3 RR 115-116). They sold some jewelry, with the transaction taking almost an hour because of the quantity and necessary paperwork (3 RR 116-117). Appellant was given a check for his sale; he was wearing a black hoody with pockets and was "amped up", different (according to the witness) from previous visits when he was "generally laid back" (3 RR 117-118). Ms. Alford agreed that State's Exhibit 44 was a picture of Appellant, wearing the clothes he had on that day (3 RR 118). She then described Appellant as shorter than the other two, who "were just bigger" (3 RR 119). Shown State's Exhibit 45, Ms. Alford stated that it was the paperwork reflecting what Appellant had sold her that day: a copy of his DL, a receipt, and a listing of the items, signed by Appellant (3 RR 120-123). The form was completed by her cousin, Jeremy, who also worked there (3 RR 123). State's exhibits 46 and 47 were then identified as the front and back of the check for $1,250.00 issued to Appellant, which he cashed at 11:58 (3 RR 124-125). Lorenzo Chester received $145 in cash for his sale, seen in State's exhibit 48 (3 RR 127-128). Similarly, State's Exhibit 49 indicates that Reco Chester also made a sale that day at Ms. Alford's business, receiving around $1200 (3 RR 129-131).

10

On cross-examination Ms. Alford disagreed that she told investigator Terry Mitchell that the men came in at about 11:30 AM, although she conceded that she was relying on her memory, that there were no video recorders in the business, and the documents had no time stamps to indicate precisely when the men came into the store and made their transactions (3 RR 135-138). The Citizens Bank, where she does business and where Appellant cashed the check, is about one and one-half miles or 6-8 blocks from her business, not a very far drive (3 RR 143-144). In the usual course of business, after the jewelry is held for a required period of time and no report is made to her of stolen property or investigation made, she melts the gold and sells it to a refinery (3 RR 144). Ms. Alford had earlier stated that she believed Appellant had a weapon, but she did not remember telling that to an investigating officer; she did not state that to investigator Mitchell (3 RR 145-146). Appellant did not show a weapon, did not threaten her with one; and she did not see one that day (3 RR 146-147).

Jeremy Simpson

Mr. Simpson worked at the "Gold Rush" store on January 14, 2013 (3 RR 153-154). On that date Appellant came into the store with two other men; they were taller than he; this was between 10:45 and 11:00 (3 RR 156). However, back on January 15, 2013, he spoke to investigator Mitchell and told him that they entered the store between 11:15 and 11:30; he changed that time frame to 10:45-11:00 two

11

days later in a second interview (3 RR 157). The witness reviewed State's exhibits 12, 13, 14, and 15 and identified the objects as some of the items sold that day (3 RR 159-162). Mr. Simpson then looked at State's exhibit 45 and identified it as the documents from Appellant's sale: a receipt, a list of the items, and a copy of his ID (3 RR 162). He described Appellant as "quiet, straight-faced" whereas the other two were "kind of pumped up" (3 RR 165). Appellant leaned "a little bit" through the window, "pointing to the stuff on the desk" (3 RR 166).

On cross-examination Mr. Simpson testified that, although the other two men were "amped up," he never saw Appellant like that (3 RR 171-172).

Megan Clark

Ms. Clark, an employee at Citizens National Bank, described some events of January 14, 2013, when Appellant came into the bank wearing a hoody and cashed a check (3 RR 178- 184). She did not feel threatened by him (3 RR 185).

Tara Roberts

Ms. Roberts, a teller at Citizens National Bank, related how she cashed a check for Appellant on that date for $1,250.00 at around 11:55-11:58, with Appellant exiting the bank at 11:59:44, as shown in State's exhibit 54, a video of that event (3 RR 187-193).

Charles David Easterling

Deputy Easterling worked for the Gregg County Sheriff's Office as a patrol

12

deputy (3 RR 200). Dispatched at 10:39 AM, he was the first officer from the county to talk with Mrs. Johnson at the scene (3 RR 201-202). She was concerned about her dog and was "in shock" (3 RR 203). She told him that at approximately 9:30 a.m. she heard a knock at her door (3 RR 204). Easterling was involved in the traffic stop where person were arrested and brought to the jail (3 RR 205). State's exhibit 55 was offered and admitted as the booking sheet on Lorenzo Daniel Chester (3 RR 206-209). Chester is described therein as being arrested on January 15, 2013, at 5:15 PM, that he is 6'1", 175 pounds, 22 years old, and had $216.75 on his person (3 RR 208-209).

The trial court then called a recess, and the jury exited the courtroom (3 RR 213). Thereafter, a hearing was held on the admissibility of certain portions of a video that the State intended to offer of an interview with Appellant (hearing begins at 3 RR 213). Counsel for Appellant raised objections about audio portions of the video that were made before the Miranda and Art. 33.22 TEX. CODE CRIM. PRO., warnings were administered, about such matters as his possession of a silver coin necklace, a polygraph, his request for an attorney (3 RR 214); counsel for Appellant contended that it was custodial interrogation, while the State argued otherwise (3 R 316-317). The objection was again made at 3 RR 217 and the trial court sustained the objection, ordering the State to delete the audio portion of those events. Appellant's trial counsel also objected to statements by Appellant where he asked

13

"about being in trouble before, trouble with the law" and talk about a polygraph, as well as asking for an attorney (3 RR 318).

Thereafter, the jury returned and was excused for the day. The trial court briefly mentioned that he had given each of the counsel a proposed charge to review (3 RR 222).

Claire Alford

When resumed trial on June 25, 2014, the State recalled Ms. Alford to testify (4 RR 9). She was questioned about a newspaper article (State's exhibits 51 and 52), stating that this was the first time she had read it and that she did not change her recollection about the time of events based on it (4 RR 9-10). She related that for each item sold, a test is done to assay its chemistry, taking some time for each item (4 RR 10-12). Ms. Alford then conceded that she was not correct in her testimony the day before, when she said someone from the bank called her about Appellant's check (4 RR 16-17).

Lieutenant Kirk Haddix

Lt. Haddix was in CID with the Gregg County Sheriff and a fingerprint expert (4 RR 21-22). On January 14, 2013, he went to Mrs. Johnson's home with two investigators, Terry Mitchell and Floyd Wingo (4 RR 22-23). He made a brief video of Mrs. Johnson and an external video of the interior and exterior of the house (4 RR 23-24). He dusted the scene for fingerprints; shown State's exhibit 56, containing

14

three photos, he stated that they yielded no fingerprints (4 RR 24-25). Shown State's exhibit 57, Lt. Haddix stated that although it was processed for fingerprints using ninhydrin, there were no prints found (4 RR 26-27). There were no prints from the entire scene (4 RR 27). However, there were instances where the residue from the dusting was consistent with leather gloves (4 RR 28). Lt. Haddix then discussed attempts at DNA evidence (4 RR 28-31) but the testing yielded no one's DNA on the objects collected, such as a nylon cord and duct tape (4 RR 34-35). One droplet of blood found in the house was identified as coming from Mrs. Johnson (4 RR 33); hers was the only DNA found (4 RR 37).

As to the white van, it was stopped by law enforcement on January 15, 2013, at about 5:00 p.m.; inside were Sandra Chester, Reco Chester and Lorenzo Chester, siblings (4 RR 38). Lt. Haddix then told of how he and others searched the van later on and found various items in the van, shown in State's exhibits 59-68 (4 RR 38-40). State's exhibit 67 shows a black jacket and a gray hoodie and other items of clothing (4 RR 41). Exhibit 63 was a jewelry box containing a gold-colored necklace and gold ring taken from the pocket of a plaid hoodie (4 RR 41). State's exhibit 38 and 38A were the actual box and its contents (4 RR 42). State's exhibit 65 showed clothing articles found in the back of the van: athletic gloves, another hoodie, and "mask-like objects" (4 RR 43). State's exhibit 60 was a black ski mask from the van; exhibit 66 was a picture of six medicine bottles found in the van with Reco

15

Chester's name on them (4 RR 44). Lt. Haddix then described the bathroom carpet in Mrs. Johnson's house found in State's exhibit 11 with footprints on it (4 RR 45), then a photo of an earring found in the van in State's exhibit 59 (4 RR 45-46), then exhibit 69 which was the actual earring, which came from one of the hoodies in the van (4 RR 46). Lt. Haddix then identified the contents of several of State's exhibits: #70 – a black and gray hoodie from the van (4 RR 47); #71 – gray hoodie from van; #71 -- "Finish Line" bag from floor of van, containing a plaid hoodie; #73 – black and gray athletic gloves; #74 – duct tape from Mrs. Johnson's kitchen table; #75 – black ski mark from van; # 76 – blue and gray glove from van; #77 – red and gray glove from van (4 RR 48); #79 – Appellant's clothes collected by investigator Mitchell on January 30, 2013; #78 – blue "Finish Line" bag from van; #80 – blue ski mask from that bag; #81 – gloves from one of the hoodies from the van; #82 -- black boots from van; #83 – six prescription bottles from van (in a blue bag) (4 RR 49). Then State #84 – a Polaroid picture from the glove box of the van [Note: all those exhibits #70-83 were admitted into evidence at 4 RR 50 without objection].

Testifying further as to Ex.s 71, 72, and 73, Lt. Haddix said the three hoodies were taken from the van between 5 and 5:30 PM on the day of the search (4 RR 51). Haddix then said it would have been possible to test the ski masks and gloves for DNA, as to fiber or hair DNA. However, those items were not sent to the lab for DNA testing; as to why not, Haddix stated that there was "nothing to compare them

16

to from anything that came from the house" (4 RR 52).

Then Lt. Haddix identified several more exhibits: #85 – a map of roads on the north side of Longview, with an "A" consistent with the location of the victim's house (4 RR 53).

After a recess, with the jury still out, counsel for Appellant objected to the admission of Ex. 56, three pictures with fingerprint powder on them, as lacking probative value and having a prejudicial effect; the trial court sustained the objection, ruling that the exhibit would be accepted for record purposes only (4 RR 56).

Resuming testimony, the State asked Lt. Haddix to identify Ex. #86, and a series of envelopes inside Ex. 86A through F; they were items sent to the DPS for analysis: duct tape and buccal swabs, admitted without objection (4 RR 57-58). Exhibit #87 and its contents were removed on January 15 from the pocket of the black and gray hoodie inside the van: papers and cards in the hoodie, admitted without objection (4 RR 58-59). The names "Lorenzo D. Chester" and "Lorenzo Chester" were on the papers (4 RR 59-60). The witness also "submitted a package containing cell phones for Investigator Mitchell…to the Secret Service Office to submit those phones for analysis" (4 RR 60).

On cross-examination, Lt. Haddix stated that he was the supervisor of CID, that he went to the scene with investigators, that Terry Mitchell was the lead

investigator (4 RR 61). Mitchell, Haddix and persons in the DA office had influence about decisions on how the case was investigated, what was sent to the lab or not (4 RR 62-63). Ultimately, it was Mitchell's overall responsibility on the case (4 RR 62).

Haddix testified that, according to officer's reports, Mrs. Johnson heard a knock on her door at about 9:30 AM (4 RR 63). Though glass was broken from a door, no fragments of glass were taken into evidence (4 RR 63). Nor were samples of rug taken from the bathroom (4 RR 63-64). Mrs. Johnson's clothes were likewise not taken into evidence (4 RR 64-65). The ski masks, the hoodies, the gloves from the van were also not sent for analysis (4 RR 65). Clothing and shoes from the Chester brothers and Appellant were collected, but none was submitted for analysis at the DPS lab (4 RR 66). If Mrs. Johnson's hair had been found on the clothing, that would, stated Haddix, have possibly been evidence to show that they were there (4 RR 66). If fibers tied to the home were found on their clothes, that would possibly have been evidence that they were in the home; Haddix had seen and heard of cases solved on that kind of evidence (4 RR 67).

Haddix agreed that if there was no analysis done on items, whether hair, fiber, trace evidence, fingerprints, "you can't get any evidence out of it" (4 RR 68). Although there were six fingerprints taken from the scene, Haddix was not able to tie them to anyone in this case (4 RR 69). Although State's Exhibit #74, the duct

tape used to tie up Mrs. Johnson, was recovered, it was never submitted to DPS for DNA analysis (4 RR 71-72). As to the three suspects in the case, law enforcement never took buccal swabs from them for DNA analysis (4 RR 72-73). Referring evidently to Exhibit #58, Lt. Haddix then stated that, as to the duct tape roll, "an apparent hair" was found, and that if they wanted additional analysis, law enforcement needed to supply 25 more hairs, but no one's hair was ever pulled from the suspects in this case (4 RR 74-75).

Continuing to be cross-examined, Lt. Haddix stated that the three persons in the van when it was stopped were Appellant's wife, Sandra Chester, and her two brothers, Reco and Lorenzo Chester, that appellant was not in the van (4 RR 75-76). None of the items in evidence were submitted for DNA analysis: fibers from Mrs. Johnson's home or the ski masks or hoodies and any hair that might be found on them (4 RR 76-77). The boots shown in Exhibit #82 had dirt on the bottom and another sort of analysis would be for soil and dirt or microscopic fibers ; however, they were not submitted for analysis nor was a soil sample submitted (4 RR 77-78). Other than Exhibit #79 identified as Appellant's clothing, Lt. Haddix did not know to whom the items of clothing in the van belonged (4 RR 78). State's Exhibit #78 was an extra-large hoodie and was "way bigger" than Appellant (4 RR 78). Also, State's Exhibit #79 was an extra-large hoodie and was "way larger" than Appellant (4 RR 79). The other items -- hoodie, gloves – were never sized to see if they

19

matched a particular individual (4 RR 79). According to Lt. Haddix: there was no DNA evidence to show that Appellant was in Mrs. Johnson's house (4 RR 80-81); there was no evidence of hair comparison to show that Appellant was ever in Mrs. Johnson's house (4 RR 81); there was no trace, fiber evidence, to show that Appellant was ever in Mrs. Johnson's house (4 RR 81); and there was no physical evidence to show that Appellant was ever in Mrs. Johnson's house (4 RR 81).

<u>Chris Miller</u>

Chris Miller stated that he was an investigator for the DA office of Gregg County (4 RR 90). On January 15, 2013, he interviewed Lorenzo Chester at about 5:30 and then at 8:30 interviewed Appellant (4 RR 91). He and Deputy Doug Moran conducted the interview, after advising Appellant of his Miranda rights (4 RR 92). Exhibit #88 was the video recording of the interview, and Exhibit #89 was a copy of the Miranda warnings, offered and admitted without objection (4 RR 93). While the video was played for the jury, Miller described how Dep. Moran was emptying Appellant's pockets during book-in at the jail (4 RR 95). Next Miller was shown Exhibits 41 and 41A and asked if the silver pendant was taken off Appellant by deputy Morgan from Appellant's pocket. He stated "yes" (4 RR 96). Miller was holding the object in his hand during the booking and asking Appellant questions about it (4 RR 96-97).

Continuing the trial after lunch, Investigator Miller resumed the witness stand

and resumed testimony about the interview with Appellant (5 RR 8). According to Appellant, he was at his house between 9:30 and 10:30 AM on the date in question, and was there with his kids, and his wife was at work at Nieman Marcus (5 RR 9). He and Investigator Mitchell went to Nieman Marcus several days later to confirm this; however, she was not at work on the 14th (5 RR 9-10). Appellant did not recall the time he went to the Gold Rush; he denied participating in the robbery, did not duct tape anyone; all he did was cash in the jewelry (5 RR 10). Appellant told his interviewers that, "You know where that jewelry came from" and refused to give samples of his DNA (5 RR 11). Then Terry Mitchell came into the interview room, pulled out the silver dollar necklace and asked Appellant where he got the item, and Appellant states, "I've been had it" (5 RR 12). Then asked where the jewelry came from, Appellant (according to Miller) tells the investigators, "Because they robbed someone" (5 RR 12-13). As to the silver coin, Appellant states, "I had it for a while" (5 RR 14) and "Man, I don't know, I don't know the exact timeframe, I've just been having it a while." (5 RR 14-15). Although he then stated that he had had the coin for at least since one of his children had been born, Appellant's final answer was "I don't know" (5 RR 14). When asked about the white van used in the robbery, Appellant says that his wife drives it, though it was in the name of her grandfather (5 RR 14). As to his wife's work, according to Miller, Appellant seemed to have trouble remembering whether or not his wife had been at work (5 RR 15). Miller

21

then stated that Appellant told them, "My two brothers, Reco and Lorenzo, brought me jewelry and I went and cashed it" (5 RR 15). Appellant was asleep when they showed up (5 RR 15-16).

Miller was then shown Exhibits #90, #91, and #92, and identified those as pictures of Reco, Appellant, and Lorenzo, respectively (5 RR 16).

On cross—examination, Miller stated that he used deception in interviewing Appellant, lied to him, used the "good cop/bad cop routine" during the interview (5 RR 25). Miller agreed that, throughout the interview, Appellant told him that he did not commit the aggravated robbery (5 RR 26). Also, Miller agreed that during the interview Appellant told him that his DNA would not be in that house (5 RR 30). Appellant admitted to Miller that he had sold the jewelry and had cashed the check at the bank; he did not lie about those matters (5 RR 32). Though Miller told Appellant he would go get a search warrant for the buccal swab, he never did (5 RR 33).

Terry Mitchell

Terry Mitchel had been an investigator with Gregg County Sheriff's office in the Criminal Investigation Division for six years (5 RR 34). At 10:53 AM he got a call to go to Mrs. Johnson's house (5 RR 35). In his interview with Mrs. Johnson, she stated that she heard a knock on her door at 9:30 AM (5 RR 35-36). After speaking with her, he went to the master bedroom and tried to lift fingerprints off a

22

chest of drawers and in the bathroom and bedroom; he also took photos of the scene (5 RR 36). Identified as Exhibits 93 and 94, two discs of pictures from the scene were admitted into evidence (5 RR 36-37). The next day he acted on a tip and went to the Gold Rush shop and spoke to the owner and one employee (5 RR 38). According to witness Jeremy Simpson, the items were brought in by persons at around 11:15 and 11:30, but then in another interview, two days later on January 17, Simpson told Mitchell that they arrived at between 10:45 and 11:00 (5 RR 39). Mitchell also spoke with Claire Alford at the shop later on the 15th (5 RR 39-40). She put the time of the arrival of the persons at 11:30 AM (5 RR 40). However, when she was interviewed on the 17th, the time was moved to 10:45 to 11:00 (5 RR 40). The persons were described as three black males, each of whom had a pocket full of gold, which they sold at the shop; she (Alford) had a receipt and copy of the DL of each (5 RR 40). Mitchell then collected the jewelry (though not all of it) from her after going through a process of photographing it (5 RR 41). Mitchell took items to Mrs. Johnson and she identified some if them as hers; but those she did not identify he returned to the shop (5 RR 41-42).

Next, Exhibits 95, 95A though D were shown to Mitchell for identification (5 RR 43). He identified them as cellphones taken at the stop of the vehicle (5 RR 44). Although they were sent off for forensic testing, nothing of evidentiary value was found on them (5 RR 44-45). Exhibit #96 was a copy of the report on the cell phones

23

(5 RR 46-47). Mitchell also requested cellphone records, but received nothing to show connection to the offense (5 RR 48-49).

Then Mitchell was shown and identified Exhibits #97, 98, and 99 as computer-generated maps of different locations in Longview to show: distance from Appellant's house on Johnson Street to Mrs. Johnson's house (#97); from Mrs. Johnson's house to the Gold Rush (#98); and from Appellant's house on Johnson Street to the Gold Rush (#99) and to compute the times from each location (5 RR 49-51). On three different trips for the route in Exhibit #97 (between Appellant's house and Mrs. Johnson's house) it was 18 minutes to drive 12.1 miles, driving the speed limit (5 RR 52-53). For Exhibit #98 (from Mrs. Johnson's house to the Gold Rush), it took 20 minutes on one trip and 11 minutes for the other two trips (5 RR 53-54). Then as to Exhibit #99 (from Appellant's house on Johnson Street to the Gold Rush), the three trips each took 16 minutes (5 RR 54).

Referring next to Exhibits 100 and 101, Mitchell identified those as documents generated from the booking of Appellant and Reco Chester into jail (5 RR 56). Appellant was listed there as 5'4" while Reco was listed as 5'11" and then Lorenzo was shown as 6' 1" tall, consistent with the descriptions of the three men who committed the robbery (5 RR 57).

Outside the presence of the jury, there was a discussion of the admissibility of State's Exhibit #102, a call from Claire Alford to the police, admissible through the

witness Jennifer Portwood (5 RR 58 ff). The exhibit was just then being brought forward by the State, whereas counsel for Appellant objected to its admissibility because it was not disclosed prior to trial (5 RR 59, 60), and that cross-examination of Ms. Alford "would have taken a slightly different tactic on that issue. I think it prejudices the defendant and makes it inappropriate letting it in (5 RR 60-61). The trial court overruled the objection and allowed the evidence in (5 RR 61).

When the jury returned, Investigator Mitchell was cross-examined by Appellant's counsel (5 RR 62). Mitchell stated that he first had contact with Ms. Claire Alford was on January 15, 2013, at the Gold Rush around noon, telling him that three black males came in the business at around 11:30 AM (5 RR 64). She told him that she knew them and had been doing business with them for about a year (5 RR 64-65). He had her call the bank to see if they had cashed Appellant's check, since she did not seem to know whether or not that had happened; she did not tell him that she had called the bank the previous day (5 RR 65-66). During their conversation, she did not tell Mitchell how long the three were in the store (5 RR 66).

However, when Mitchell returned to the Gold Rush on January 17, she changed the timing of when the three had arrived, setting it 10:45 to 11 AM, whereas on the 15th she had said 11:30 AM. Also different was the fact that on the 17th she said the three had done business with her before but that she had not seen

25

them in about a year, which was the opposite of what she had said on the 15th (5 RR 66-67). She never told Mitchell on either occasion that she felt threatened by the men (5 RR 67).

Similarly, Mitchell confirmed that the other witness from the Gold Rush, Jeremy Simpson, told him on the 15th that the men came in at between 11:15 and 11:30 AM, but two days later changed that to between 10:45 and 11:00 AM. And while he had told Mitchell on the 15th that he did not wait on the men, on the 17th he said that he did wait on them on the 14th (5 RR 67-68). Simpson also did not tell Mitchell that he felt threatened by the men (5 RR 68).

As to Mrs. Johnson, Mitchell agreed that she told him that she heard the knock at the door at about 9:30 AM; she said nothing to him about looking at a clock to confirm the time (5 RR 68-69). Mitchell did not disagree that in a 20 mile radius of Mrs. Johnson's house thousands of short black or white men and women lived (5 RR 70). He also stated that not all of Mrs. Johnson's items were recovered: some jewelry, TVs, a gun, and a cell phone (5 RR 70-71).

As to the driving distances and times, he agreed that it would be an 18 minute trip from Mrs. Johnson's house to Appellant's, and then from Appellant's to the Gold Rush another 16 minutes; so a total of 34 minutes for that trip (5 RR 71-72).

Jennifer Portman

Ms. Portman described her work in charge of personnel in the 911

26

communications office for Gregg county as regards 911 calls, how the calls are recorded and date and time stamped (5 RR 76-77). She had been requested to search for calls on January 14, 2013, between the hours of 4:00 to 6:30 PM; she found a call from Claire Alford, owner of the Gold Rush concerning information "pertinent to the robbery case that we had a media release on" (5 RR 78). Her employee, Chelsey Bell received the call; Ms. Portman was familiar with Bell's voice, though not Alford's (5 RR 79). Ms. Portman then transcribed the call to a disc, marked at State's Exhibit #102. The exhibit was then offered by the State, and counsel for Appellant objected as before, which was overruled (5 RR 80). Thereafter the exhibit was played for the jury (5 RR 81).

On cross-examination Ms. Portman stated that she received the request for the exhibit that day, retrieved the call, and turned it over to the DA's office (5 RR 82).

The State rested (5 RR 83).

Appellant's Case-in-Chief

Sandra Brown

Ms. Brown testified that she had been married to Appellant for four years (5 RR 85-86). They had been together for nine years and had three children, ages seven, four, and three (5 RR 86). On January 14, 2013, she was employed by Neiman Marcus and had worked there for five months ( 5 RR 86-87).  She processed clothes, shoes, and jewelry for them (5 RR 87). That date she and Appellant lived at

27

601 Johnson Street in Longview; Appellant's father also lived there, and she had two brothers, Reco and Lorenzo, the latter of whom would stay there off and on (5 RR 87). Reco lived elsewhere (5 RR 88). On January 15, 2013, she and her two brothers were arrested as they were driving in the van (5 RR 88). Lorenzo had asked her to take him to a friend's house; she was driving him to his girlfriend's house, when she pulled into a store because he had said he would walk the rest of the way, but then they were arrested (5 RR 88).

She had not gone to work the day before, because she was not feeling well, something that lasted a couple of days (5 RR 89). She had stayed at home on January 14, and early on that day between 8 and 9 AM Lorenzo had come and borrowed the van; Reco was not there; he had been dropped off at his girlfriend's house the night before (5 RR 89). Appellant was with her, as well as his father and the children (5 RR 90). Lorenzo returned with Reco later that morning, between 11 and 12, although Ms. Brown was not sure about the exact time (5 RR 90-91). Appellant was with her that entire time (5 RR 90).

When Lorenzo and Reco came back, Appellant was still in bed; Lorenzo came in and woke Appellant and "told him that he needed him to do something for him" (5 RR 91). This occurred over a fairly short period of time; she had no idea what they were going to do (5 RR 91).

On cross-examination Ms. Brown stated that her brothers kept clothes in the

back of her van (5 RR 107).

<u>Appellant Cordero Brown</u>

Appellant testified that he was 27 years old, married to Sandra Brown, and had four children and gave their ages (5 RR 113-114). He stated that he was not a part of the aggravated robbery of Mrs. Johnson, that he did not go to her house on January 14, 2013 (5 RR 114). On that morning he was home with his wife and children (5 RR 115). Lorenzo and Reco stayed there at night from time to time, kind of in and out (5 RR 115). Appellant recalled that on that morning he was awakened by Lorenzo, and by the time he got to the living room, Reco was standing there (5 RR 115-116). Appellant got out of bed; Lorenzo asked him "to help him cash some jewelry. I agreed, got dressed" (5 RR 116). Lorenzo did not tell him that the jewelry was stolen; he wanted Appellant to go because there would be a better chance of getting more money in bargaining (5 RR 116). That is, with three people going in with parts of the jewelry, they stood a better chance of getting more money; so Lorenzo split the jewelry among the three of them; Appellant's share had already been placed in a Ziploc bag and that was how it was given to him (5 RR 117).

Commenting on the time it took to leave the house, Appellant stated he put on his pants that were by the bed, brushed his teeth and left, taking two, three, four minutes (5 RR 118). He drove the van to the Gold Rush (5 RR 118). Appellant then told his route of travel from his home to the Gold Rush, and that it would not have

29

been much longer than the 16 minutes given by Investigator Mitchell (5 RR 120). He then testified that he did not spend a long time in the Gold Rush, describing the process of offering the gold, testing it, weighing it, and then making an offer to buy; writing down the items, signing off on that. It would not have taken an hour; "no longer than 30 minutes at the most" (5 RR 121). He said Lorenzo and Reco were a little loud and he told them to "respect the place of business" (5 RR 121).

Next Appellant stated that he did not think that the items came from a robbery, that Lorenzo gave it to him, that he did not know it was stolen (5 RR 122). Appellant then stated that he when went to the bank to cash the check for $1250, he did not try to hide his face (5 RR 122-123). After cashing the checks, Lorenzo gave Appellant and Reco $300 apiece (5 RR 123). Lorenzo had stayed at Appellant's house and ate their food, so Appellant did not hesitate in taking the $300 from him (5 RR 123-124).

Appellant then said that he had gone through the 11th grade and that he had some intelligence, that he was not stupid enough to be involved in a robbery and then go and immediately sell the items just down the road (5 RR 124).

As to the video interview, Appellant stated that he was shocked at the events of the robbery, and was shocked and scared (5 RR 125-126). He told the detectives up front what he did in selling the jewelry and cashing the check; that he did not lie to them (5 RR 127). As to the silver coin, Appellant testified that it was a coin that

30

Lorenzo let him keep; he lied to the detectives about it because they were connecting it to the robbery and "I knew there was no possible way I could truly explain where the jewelry come from" , and that he was scared because it was clear that the detectives were "out to get " him (5 RR 127). He had not known the coin was stolen until the police told him it came out of the robbery; he apologized for lying about it (5 RR 128). Appellant refused to volunteer a DNA sample because he did not know what else to do at that point, that he did not know what his legal rights were and that he would be more comfortable with them getting a search warrant since he did not have an attorney present (5 RR 128). However, the detectives, though they said they would come back with a search warrant for a DNA swab, never did so (5 RR 129). He told them: "I was a hundred percent sure my DNA wouldn't be in that house because I wasn't on the scene, which I wasn't." (5 RR 129).

Appellant concluded his testimony by stating that he never went into Mrs. Johnson's house, that he did not rob her, that he did not help Lorenzo rob her, and that he was truly innocent (5 RR 129-130).

On cross-examination Appellant concurred that he had gotten the jewelry from Lorenzo, his brother-in-law, and had told this to Investigator Miller; however, he again stated that he did not know where it came from, that he told Miller, "You know where that jewelry came from" because "I suppose he know how I got it. He know who brought it to me because I had already told him I got it from my brother-

in-law" (5 RR 138). Appellant stated that he did not recall what jewelry was there; he did not investigate the jewelry, did not look through the jewelry, that he just cashed it (5 RR 138). Appellant disagreed that he told Miller (during the taped interview at 20 minutes through 21 minutes) that he obtained the jewelry from Lorenzo and Reco "Because they robbed someone." Instead, he says that his remark was this: "Because it was brought to me." (5 RR 138-140).

The defense rested its case after Appellant's testimony was over (5 RR 149). After placing Exhibit #103 into evidence, the State closed its evidence. (5 RR 150).

After the jury was excused for the day, the Court and counsel discussed the proposed charge (5 RR 152 ff).

Argument and Verdict: Guilt/Innocence

Resuming trial on June 26, 2014, the trial court entertained an objection to the Court's Charge made by counsel for Appellant, requesting a charge on alibi taken from McClung's 2008 edition (labeling it and offering it as Defendant's Requested Instruction No. 1; *see*, Supp. CR); this was overruled (6 RR 5). State's Exhibits #104 and #105 were admitted for record purposes only: the full interview of Appellant and the video from the Bank (6 RR 6). Thereafter, the jury was brought in, and the Court's Charge read (6 RR 7-8).

Counsel for the State opened argument (6 RR 8-19). Then counsel for Appellant argued (6 RR 19-38). Then the State closed argument ( 6 RR 38-50).

Court recessed as the jury retired to deliberate (6 RR 51). At one point the jury came into the courtroom to view the video from the bank and the video of Appellant's custodial interrogation (responding to a request from the jury) (6 RR 53-55). Thereafter (6 RR 55-56), the jury once more retired to deliberate, with the trial court sending back to the jury room several articles of clothing (3 hoodies, boots) and the silver coin requested by the jury (6 RR 56). Following a lunch recess (6 RR 57-58), the jury retired once more for deliberations, and verdict was reached of "guilty" (6 RR 60, CR 31).

Punishment Phase

With the jury out, the State and Appellant made arguments pro and con over the State's use of Exhibits #110, 111, 112, and 113: certain copies of documents taken from Appellant's Facebook page (7 RR 8). Counsel for Appellant objected to the documents as to their authenticity and admissibility (7 RR 6). With the jury out and Sandra Brown testifying, the State sought evidence to prove that the exhibits were from Appellant's Facebook page (7 RR 9-10). The State pointed to a photo of Appellant and a description on Ex. 110; then similarly on Ex. 111. (7 RR 11). Ex. 112 was the same as Ex. 110, but without the words (7 RR 11). However, through voir dire from Appellant's counsel, Ms. Brown stated that she did not know who might have put the writings on the pages (7 RR 12). Appellant's counsel objected to Ex. 110 and 111 in that they were not "adequately or properly authenticated" and

33

that they did not have relevance to any punishment issue (7 RR 13). One of the exhibits showed Appellant in his own residence with a gun, a lawful act and not pointing it at anyone, and there was no evidence that it was a real gun (7 RR 13-14); additionally, he argued that the probative value – if any – far outweighed the prejudicial impact of the exhibits (7 RR 14).

The trial court ruled that Ex. 111 would be admissible without the words, which was Exhibit 112; so the trial court allowed Ex. 112 (7 RR 15). Exhibit 110 was not admitted; the objection to it was sustained (7 RR 16). However, Exhibit #113 was admitted with no objection from Appellant (7 RR 16). Counsel for Appellant, however, continued to raise his objections to Exhibit #112 (7 RR 16). Repeating his rulings, the trial court sustained the objections to Exhibits #110 and #111, and admitted #112, and #113, with objection "noted on the record" (7 RR 17).

With the jury returned, the State opened its evidence by offering State's Exhibits #106, a conviction for UCW, #107, a conviction for evading arrest, #108: UCW, and #109: deadly conduct; counsel for Appellant stipulated that Appellant was the same person convicted in those misdemeanors (7 RR 19). With no objection to their admission, those four exhibits were then placed into evidence. The parties also stipulated that Appellant had never before been convicted of a felony and was therefore eligible for probation (7 RR 20).

Sandra Brown testified that Exhibits #112 and 113 were photographs from

Appellant's Facebook page; overruling Appellant's objection to #112, both exhibits were admitted into evidence (7 RR 21). On cross-examination Ms. Brown stated that Appellant had been in jail since January 15, 2013 (7 RR 22).

Mrs. Johnson then testified that the events of the robbery had "changed my whole life" (7 RR 24), and described various physical and emotional problems she had suffered since those events (7 RR 24-25).

After the State rested its case, Appellant's counsel called Rhonda Bradley to testify (7 RR 27). She was Appellant's older sister; there were nine siblings in their family, with Appellant the youngest (7 RR 28). She stated that Appellant's father and other friends had been in attendance at the trial, being supportive of him (7 RR 30). She described Appellant as a good father to his children who took care of them, family-oriented (7 RR 30). Before his mother died in 2010, Appellant had worked various jobs like fast food, ranch hand, building fences and keeping cows and horses; he was someone who would help other people (7 RR 31).

Argument was thereafter made by both sides (Appellant: 7 RR 43-50; State: 7 RR 50-54). The jury retired, deliberated, and returned a sentence of sixty years (7 RR 56; CR 39). The trial court then passed sentence (7 RR 58-59; CR 18) and appointed counsel for appeal (7 RR 59).

MOTION FOR NEW TRIAL

On September 2, 2014, Appellant's Motion for New Trial ( CR 70) was heard, at which MNT Exhibit #1 was introduced into evidence – the standing order for pre-trial issues in Gregg County. After hearing arguments, the motion was denied (9 RR 13; CR 82).

**SUMMARY OF THE ARGUMENT**

DURING VOIR DIRE THE STATE DID NOT PRESENT RACE-NEUTRAL REASONS FOR ITS STRIKES OF AFRICAN-AMERICAN JURORS, AND THEREFORE, THE TRIAL COURT ERRED IN DENYING APPELLANT'S *BATSON* CHALLENGES. THERE WAS NO LEGALLY SUFFICIENT EVIDENCE THAT APPELLANT COMMITTED AGGRAVATED ROBBERY: NO EYE-WITNESS IDENTIFICATION, NO SCIENTIFICALLY RELIABLE EVIDENCE SHOWING HIM AT THE SCENE, NO ADMISSION FROM APPELLANT, WHO PROVIDED AN ALIBI FOR THE TIME OF THE OFFENSE. THE TRIAL COURT REVERSIBLY ERRED IN NOT ALLOWING AN INSTRUCTION ON THE DEFENSIVE ISSUE OF ALIBI, WHEN APPELLANT AND HIS WIFE BOTH OFFERED TESTIMONY PLACING HIM ELSEWHERE AT THE TIME OF THE OFFENSE. THERE WAS REVERSIBLE ERROR WHEN THE TRIAL COURT PERMITTED THE STATE TO PLACE A PHOTO OF APPELLANT INTO EVIDENCE, NOT RELEVANT TO ANY PUNISHMENT ISSUE. THERE WAS REVERSIBLE ERROR WHEN THE TRIAL COURT ALLOWED THE STATE TO PLAY A 911 TAPE WHOSE EXISTENCE WAS NOT DISCLOSED TO APPELLANT PRIOR TO TRIAL.

**ARGUMENT AND AUTHORITIES**

**FIRST ISSUE, RESTATED:**

**THE TRIAL COURT ERRED IN REFUSING *BATSON* CHALLENGES**

After jury strikes were made, recorded, and the jury seated (VD RR 126-127), counsel for Appellant made his challenge to the jury, citing to *Batson v. Kentucky*, 476 U.S.79 (1985), and Article 35.261, TEX. CODE CRIM. PRO., requesting that the jury be dismissed and a new array assembled (VD RR 127). He stated that African Americans (Appellant's ethnic group) were struck by the State: No. 2, Rogers; No. 22, Bee; 34, Hawkins; 35, Smith; 36, Bell. Of those African-Americans remaining, No. 12 was an agreed strike (she disqualified herself) and No. 38, Miller, struck by the defense (a probation worker, pp. 22-23).

The State struck three African-American jurors: No. 2, Rogers and reasoned that she was young and had several piercings; thus it was a race-neutral reason to strike her (VD, RR 128). As to No. 22, Ms. Bee, she was a retired postal worker, as was No. 34, Mr. Hawkins, a postal worker who also said that he felt his brother had been wrongly accused in Smith County  (see, VR RR, 85-87). Said the prosecutor: "The State has had a problem with postal workers in the past, and that's very scary to this prosecutor working in this  particular venue." (VD, RR 129). The State  also pointed out that it did not strike No.s 35 or 36 (VR RR 129). The trial court found that the State had given race-neutral reasons for its strikes and denied the Batson challenges (VD, RR 129-130. The trial court stated: "It's very common for the State, prosecutors throughout the State, not to take postal workers" (VD RR 130). However,

the trial court referred to no scientific study or other compilation of data upon which to base that observation.

The Fourteenth Amendment's Equal Protection Clause prohibits a prosecutor from using a peremptory strike to exclude otherwise qualified and unbiased persons from a jury sole by reason of their race. *Powers v. Ohio*, 499 U.S. 400, 409 (1991). To raise the claim, the defendant must first make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. *Hernandez v. New York*, 500 U.S. 352, 359-60 (1991). Once that showing has been made, the burden shifts to the State to articulate a race neutral explanation for striking the jurors on question. *Id*. Once that has been done, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Hernandez, 500 U.S. at 359-60. See, Snyder v. Louisiana*, 552 U.S. 472, 476 (2008); *Young v. State*, 283 S.W.3d 854, 866 (Tex. Crim. App. 2009). *Whitsey v. State*, 796 S.W.2d 707, 713-14 (Tex. Crim. App. 1989) gives a list of five different "factors" for the trial court to analyze to see if a challenge is merely a pretext: (1) the reason given is not related to the case, (2) there was a lack of questioning or meaningful questioning of the juror; (3) disparate treatment, i. e., persons with the same or similar characteristics as the challenged juror were not struck, (4) disparate treatment of venire members, i.e., questioning a certain juror to evoke a certain response without asking the same question of other panel members; (5) an explanation based on a

38

group bias where the trait is not shown to apply to the challenged juror specifically. Trial court's finding on the issue of discriminatory intent should not be overturned unless its determination is clearly erroneous. *Snyder,* 552 U.S. at 477. A defendant must prove by a preponderance of the evidence that the allegations of purposeful discrimination were true in fact and that the State's reasons were merely a sham or pretext. *Watkins v. State*, 245 S.W.3d 444, 451-52 (Tex. Crim. App. 2008).

Here, counsel for Appellant made his prima facie case: he pointed out to the trial court that his client was African American and specified those potential jurors struck by the State who were African American (VD, RR 128-129). There were six jurors dismissed by agreement: 11, 12, 20, 23, 33, and 37. That put the strike zone for the twelve at juror number 38 and below, with three for alternate between 39-41 (Court's list at CR 61-64; final jury list at 51-52). That is 35 venire persons. Each side was allotted 11 strikes. The State used three of its eleven peremptory challenges to strike African-Americans or 27.27%. As a percent of those in the strike zone (35), African-Americans were 6 of that 35 or 17.14% of possible jurors. Thus, the State exercised a statistically disproportionate number of strikes against African-Americans. Disproportionality serves to establish a prima facie case and may also support a defendant's "ultimate burden of persuasion that the State's proffered race-neutral explanations are a sham" *Watkins*, 245 S.W.3d at 452.

Focusing on juror Bee, a **retired** postal worker (citing to *Whitsey* "factors"): (1) there was no attempt to relate work for the USPS to any facet of the case at bar; (3) there was a lack of questioning or meaningful questioning of Ms. Bee; and (5) the prosecutor offered an explanation based on a group bias where the trait is not shown to apply to the challenged juror specifically – the prosecutor never asked Ms. Bee about her **former** occupation and whether or not she would allow that to interfere with her duties as a juror. So three of five "factors" are there to indicate a pretext. What did the prosecutor say about it? "The State has had a problem with postal workers in the past, and that's very scary to this prosecutor working in this particular venue." That does not refer to any trial where this prosecutor tried a case and got an adverse result because a USPS employee served on the jury. He merely says "the State", something surprisingly echoed by the trial judge as well, as if there were a hard and fast State-wide bias on the part of USPS workers against the State. No scientific study was offered to support those bald assertions. Where is that evidence? It certainly is not a part of the record in this case.

The State's "race-neutral" reason for striking Ms. Bee, who no longer even worked for the post office, looks very much like a pretext for striking her because of her race.

As to Ms. Rogers (juror No. 2) the prosecutor said that she was young (21) and had lip, nose, and ear piercings; therefore, he struck her (VR RR 128). Using the

40

*Whitsey* analysis, how does that not show pretext? The prosecutor never asked Ms. Rogers about how any of that would affect her as a juror, never showed how a 21 year old, someone with piercings, how any of that affects the perception/reception of evidence and the presence or lack of bias; he never stated that such persons were unreliable as jurors in the past. One also wonders just how many of the seven Anglo women who made the jury might have had their ears pierced, a fairly common practice in our society, yet they were not struck. Again, piercings and youth remain completely unexplained and without any reasonable relationship to the role as juror in the case at bar. The case for pretext is very strong.

Then there is juror #34, Mr. Hawkins. The prosecutor struck him because he was a postal worker and because "he had some other issues where he thought he (sic) brother was wrongly accused in Smith County" (VD RR 129). Query: What was the question that the prosecutor put to the venire? Going back earlier in the questioning, the prosecutor asked: "Anyone out there have a personal experience with theft or violent crime that's occurred to them or a loved one that they're probably going to be thinking about as we go through a trial that involves theft or violent crime?" (VD RR 80, lines 2-6). After hearing from a variety of venire persons over the next few pages, Mr. Hawkins related how about 25 years ago his brother was arrested for a robbery of a Dairy Queen because of the brother's association with some friends and had to go "through a prolonged trial to prove his innocence for that" in Smith County (VD RR

85). With the other venire persons who brought up an experience with being a victim of a crime, the prosecutor asked them if that experience would affect their deliberations, or if they could be fair and impartial, or if it would be a problem in this case. [1] However, the prosecutor did not ask Mr. Hawkins that kind of question. Neither did he ask Mr. Hawkins if his service as a USPS employee would bias him against the State's case.

Using the *Whitsey* analysis, Appellant contends that the same arguments raised about Ms. Bee apply to Mr. Hawkins, plus, there was disparate treatment of Mr. Hawkins from others who responded to the question. *See Whitsey* "factors" (3) and (4): disparate treatment of jurors. The prosecutor asked each of them how the experience would affect their ability to serve as a juror and got a response. But with Mr. Hawkins the question was never asked or answered. All of this knocks the excuse of "postal employee" out of a race-neutral reason and places it into the pretext classification.

Finally, the case at bar is, therefore, distinguishable from *Leadon v. State*, 332 S.W.3d 600, 612-13 (Tex. App. – Houston [1st Dist.] 2010, no pet.), where the prosecutor used the postal worker rationale as a race-neutral reason for striking an

---

[1] # *8 Lakanen (VD RR 80); #9 Cox (VD RR 81); # 11 Hunter (VD RR 82); # 25 Hailey (VD RR 83-84); # 31 Buckner (VD RR 84); # 33 Poindexter (VD RR 84-85); # 37 Perritt (VD RR 86). Hunter, Poindexter and Perritt were agreed strikes. The remaining four were struck by the Defense. One must conclude that the State found nothing objectionable in them.

African-American prospective juror; there, the prosecutor stated that he "specifically had one case that was hung with a United States Postal Worker. Also, my experience in talking with witnesses and juries after cases have been resolved, I've experienced problems with regard to that as an occupation." The Court of Appeals found no violation of Fourteenth Equal Protection in that case. It reasoned that the prosecutor's reason for the strike, under the record made there, was race-neutral.

To the contrary, no such personal experience of the prosecutor in the case at bar was a part of the record. No description by the prosecutor of nonverbal responses to questions during voir dire is found in the record, or other overt, observed, reactions by these venire persons to either the State's or Appellant or his counsel. In fact, no questions were ever directed to Ms. Rogers or Ms. Bee, and they never responded verbally in the record to any question put by either party's counsel. Mr. Hawkins responded to the prosecutor's question; however, without exception the prosecutor asked all the other persons in the strike zone (who also responded to the question) if they could set aside their experiences, but never put such a question to Mr. Hawkins. So what is the basis, in this record, that justified the strike?

The trial court was clearly erroneous erred in denying the *Batson* challenges. The cause should be reversed and remanded for a new trial.

**SECOND ISSUE, RESTATED**

**THE EVIDENCE WAS LEGALLY INSUFFICIENT
TO CONVICT APPELLANT OF AGGRAVATED ROBBERY**

The State's burden is to prove each and every element alleged beyond a reasonable doubt. *See*, Due Course of the Law provision, TEX. CONST., art. 1, § 19, and TEX. CODE CRIM. PROC., Art. 1.04; *Wilson v. State*, 536 S.W.2d 375, at 377 (Tex.Crim.App. 1976) ( state law). Federal argument rests in due process rights as guaranteed under U.S.CONST. amend. XIV; *see, Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *In re Winship*, 397 U.S. 358 (1970). The Texas Constitution provision has been held analogous to Fourteenth Amendment Due Process. *See, Webb v. State,* 278 S.W.2d 158, 160 (Tex. Crim.App. 1955). Under legal sufficiency, all the evidence is reviewed in the light most favorable to the jury's verdict to determine whether or not any rational jury could have found the essential elements of the crime beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). Review focuses on quality of evidence. *Brooks*, 323 S.W.3d at 917-918 (Cochran, J., concurring). As to legal sufficiency under *Brooks*, deference is made to the responsibility of the jury to "fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App.

2007)(citing *Jackson*, 443 U.S. at 318-319). Legal sufficiency of the evidence is measured by the elements of the offense, defined by hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

To prove its case for aggravated robbery the State must bring legally sufficient evidence to establish that (1) Appellant (2) in the course of committing theft, (3) with the intent to obtain or maintain control of the property (4) intentionally or knowingly (5) threatened or placed the victim in fear of imminent bodily injury or death, and (6) used or exhibited a deadly weapon. TEX. PENAL CODE § 29.02-29.03 and definitions at TEX. PENAL CODE § 6.03(a) and (b).

The evidence to convict Appellant is purely circumstantial. There is no witness who identified Appellant in court as the short person who was present at the scene of the robbery, None. So what is left of the State's case? They are as follows, with the weakness of that evidence demonstrated as well.

First, the State contends that there were three persons at the scene, two tall, one short. Appellant is shorter than the other two men, Lorenzo and Reco. **However**, Mrs. Johnson is not sure of the gender of the short person--- maybe male or maybe female.

Second, the State says that Appellant participated in the selling of the stolen

goods and cashing a check. **But** he was open about both events and did not try to hide that participation.

Third, the State makes much about how Appellant was in possession of a silver coin necklace taken in the robbery and, under questioning by investigators, lied about where he got it. **Yet** the weakness of that argument is that he was also in possession of the gold jewelry before he sold it to the Gold Rush. So its origin can be traced to Lorenzo and Reco, but that does not mean he participated in the robbery.

Fourth, the State argues that, looking at the time line for Lorenzo and Reco to go from the victim's home, to Appellant's home, and then to the Gold Rush – that such a time line goes against Appellant merely participating the sale of the goods and not being a participant in the robbery. The State argued that such a time line is 'impossible" (5 RR 18). **But** was it? Not under the times first given by Mrs. Jackson and Ms. Alford.

So does the State get beyond reasonable doubt when the issues are in such controversy and contradiction? The ruling principal in this is: an appellate court presumes that the trier of fact resolved any conflicts in the evidence in favor of the verdict and defers to that resolution, **provided that the resolution is rational**. *See, Jackson,* 443 U.S. at 326. Appellant contends that, given the state of the evidence, it

was not rational for the jury to find his guilt beyond a reasonable doubt; the evidence was legally insufficient. Since the evidence is legally insufficient, the case should be reversed and remanded with a judgment of acquittal.

## ISSUE THREE, RESTATED

## THE TRIAL COURT REVERSIBLY ERRED IN DENYING A REQUEST FOR A JURY INSTRUCTION ON ALIBI

As shown above (Brief, p. 32), Appellant requested a jury instruction on alibi, which was refused. (See, Supp. R.). The requested instruction was as follows:

"A defense set up by the defendant in this case is what is known as alibi, that is, if the offense was committed, as alleged, the defendant was, at the time of the commission thereof, at another and different place from that at which the offense was committed, and therefore, was not and could not have been the person who committed the same. Now, if you have a reasonable doubt as to the presence of the defendant at the place where the offense was committed, if an offense was committed, at the time of the commission of the offense, then you will find the defendant not guilty. If you entertain a reasonable doubt as to whether the defendant was present at the time and place when and where [the aggravated robbery was committed, if it was], then you will find the defendant not guilty."

Appellant requested the instruction because he and his wife both testified that he was at home at the time of the offense.

The jurisprudence of this State decided that alibi was no longer available as a defensive instruction in *Giesberg v. State*, 984 S.W.2d 245 (Tex. Crim. App. 1998), overruling over one hundred years of precedent, and over the dissent of Judge Baird.

There is authority holding that when a trial court declines to charge on a defensive issue, she or he "dilutes the defendant's jury trial by removing the issue from the jury's consideration. In effect, the trial court directs the verdict against the defendant." See, *Bursten v. United States*, 395 F.2d 976, 981 (5th Cir. 1968), citing to *Strauss v. United States*, 376 F.2d 416, 419 (5th Cir. 1967), which in turn cited to *Bryan v. United States*, 373 F.2d 403 (5th Cir. 1967). It has also been stated: "It is self-evident, we think, that the Fifth Amendment requirement of proof beyond a reasonable doubt and the Sixth Amendment requirement of a jury verdict are interrelated…In other words, the jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt….an instruction of the sort given here does not produce such a verdict". *Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993) (holding an instruction on the death penalty unconstitutional).

The Supreme Court in *Sullivan* finds a constitutional right to a correct jury charge in the intersection of the Fifth and Sixth Amendments. The Texas Court of Criminal Appeals in *Giesberg* opined that the defense of alibi was no longer available because the Legislature had not placed it in the Texas Penal Code in its revision of 1976. The Court seemed to think that this was the determinative axis upon which

turned the rights of the accused. It continued its dissection of the alibi defense by the somewhat puzzling rationale that, if it were continued to be given, it would constitute a comment on the weight of the evidence. (Apparently, in offering that rationale, the Court ignored the fact that, in over a century of decisions, no court had found such a problem in giving the instruction and that Federal courts do not so hold). Moreover, it went on to say that alibi was already before the jury, since whether or not the defendant committed the offense (*ergo*, was present at the scene) was an element of the offense, which, if not proven, would lead to "not guilty." Yet nowhere in the Court's analysis did it take into consideration the Fifth and Sixth Amendment jurisprudence articulated by Justice Scalia in *Sullivan*, even though that decision predates *Giesberg* by five years.

Appellant contends that the alibi defense he requested is grounded upon the same Fifth and Sixth Amendment guarantees as seen in *Sullivan* because the instruction is founded upon Reasonable Doubt and the right to a jury trial, i.e., for the **jury** to decide the issue, not **the trial court**. There is no comment on the weight of the evidence explicitly to require the jury to focus on the whereabouts of a defendant at the time of an offense. To the contrary, by NOT setting that as a focus, they are free to disregard the evidence so carefully placed before them by Appellant. As the Fifth Circuit Court says in *Bursten, id*., by not giving the instruction, the issue is removed from the jury's consideration and the judge, in effect, directs the verdict

49

against the defendant. How can the jury know that alibi is before it, when the language is never placed in the charge? Stated another way, in the absence of alibi language, does that not give the State a head-start toward its burden of proof of a defendant's involvement in an offense? So where is the issue of "comment of the weight of the evidence" at that point? Tacitly, by NOT giving the instruction, the State, aided by the trial court's decision, has gained an advantage before deliberations have even started.[2]

With the alibi instruction, which includes "reasonable doubt," the jury is compelled to consider whether or not the State has in fact, beyond a reasonable doubt, proven the presence of Appellant at the scene of the offense; the instruction says: "Now, if you have a reasonable doubt as to the presence of the defendant at the place where the offense was committed…..then you will find the defendant not guilty." After all, it is the Appellant whose freedom is at stake, not whether the State gets a conviction. Without the instruction, Appellant contends, he was placed at a

---

[2] Linguistics scholar Benjamin Lee Whorf, in the collection of his essays, *Language, Thought, and Reality* (M.I.T. Press 1956), at p. 135, recounts (*see*, chapter: "The Relation of Habitual Thought and Behavior to Language") how when he worked for a fire insurance company, he studied hundreds of reports of circumstances surrounding the start of fires and explosions. When workers were around containers labeled "gasoline drums" they took great care; whereas, when they were around storage of "empty gasoline drums" they behaved differently, carelessly, with little repression of smoking and tossing cigarette stubs about; yet the "empty" drums were the more dangerous because of explosive vapors. Mistakenly, the word "empty" meant that there was no hazard. Just so with the "absence" of alibi from the jury charge: there is still something at work in the charge, namely, the fact that the State is not pressed to deal with alibi, and the defendant is deprived the benefit of the jury's contemplations upon alibi and deprived of the stress upon "reasonable doubt" in their deliberations of alibi. Absent the alibi instruction, the State's path to conviction is eased, to Appellant's detriment. Whorf's book can be accessed through archive.org.

disadvantage. The argument, that the Legislature failed to include alibi as a defense, is a red herring and lacks logical force. Since when did an act of the Legislature ever stop a court from deciding whether or not a Constitutional right has been infringed?

Additionally, albeit in another context (Sixth Amendment Confrontation Clause), *Davis v. Al*aska, 415 U.S. 308, 317 (1974), holds that a jury is "entitled to the benefit of the defensive theory before them so they could make an informed judgment…" Just so with the Sixth Amendment right to a jury trial and its corresponding right in Art. 1, § 10, TEX. CONST: the jury is entitled to the benefit of the alibi defensive theory so they can make an informed judgment in the jury room. How can the jury know that alibi is the defensive theory unless they be expressly informed in the charge? The jury is not composed of members of an appellate bench or scholars in an elite law school, versed in the subtleties of what is subsumed within a charge and what is not. It defies common sense, human nature, the powers of language (*see*, Whorf), and the Constitution to assume otherwise.

Appellant argues that the trial court reversibly, constitutionally, erred in not giving an instruction on alibi. *See*, *Sullivan* and *Davis*. Since it is "constitutional error of the first magnitude and no amount of showing want of prejudice could cure it" (*Davis*, 415 U.S. at 318), the case should be reversed and remanded. Rule 44.2(a), TEX. R. APP. PRO.

## FOURTH ISSUE, RESTATED

## THE TRIAL COURT REVERSIBLY ERRED IN
## ALLOWING INTO EVIDENCE A PHOTO OF
## APPELLANT WITH A GUN

As related above (Brief, pp. 33-34) appellant objected at punishment to the introduction of a picture of Appellant holding a pistol, State's Exhibit #112, but that objection was overruled, and it is was received into evidence. Appellant's objections were: lack of authentication, admissibility, and relevance. As to the latter, Appellant contended that any probative value it had was outweighed by its prejudice; moreover, Appellant was in his own home at the time of the picture and was not using the weapon toward anyone (7 RR 13-14). The State countered and said that a gun was used in the robbery and that Appellant had two prior convictions for unlawfully possessing a weapon; also it argued that the possession of the gun was in itself a "bad act" and that it did not need to be illegal (7 RR 14).

The error falls under Rules 403 and 404(b), TEX. R. EVI. Rule 404(b) forbids the use of character evidence for the purposes of proving action in conformity therewith. *See, Fox v. State,* 283 S.W.3d 85, 93 (Tex. App. – Houston [14th Dist.] 2009, pet. ref'd). Yet that was the rationale cited by the State: "We believe this is a highly probative picture to show the character in which we are dealing with…" (7 RR 14, lines 24-25). Moreover, how can the possession of a pistol in one's own home, not pointed at anyone, ever be remotely defined as a "bad act"? There are going to be

52

a host of hunters, pistol, rifle, and shotgun owners alike, who swear by the Second Amendment, who would be surprised to learn that, in the eyes of the State's prosecuting attorneys, they are committing bad acts every day of the week by owning and handling such weapons in the sanctity of their own homes. How absurd! As to the use of a weapon in the course of the robbery, there was never any evidence that Appellant held the pistol used in the crime. On the other hand, the picture plays upon the fears of the jury and allows them to identify the use of a weapon with Appellant, something not supported by the evidence. And what purpose outlined in Rule 404(b) is given for its use? None. Those reasons are completely absent. Instead, the State expressly says that it was to show the character of Appellant.

Under a Rule 44.2(b), TEX. R. APP. PRO., non-constitutional error analysis, the use of the photograph affected the substantial rights of Appellant. *See, Fox, id.* The jury assessed a sentence at the farthest range of punishment, 60 years. Had they not seen the picture, had Appellant's counsel not been compelled to try to defuse the picture during his examination of Ms. Brown (7 RR 32) and during his argument (7 RR 47), had the State not questioned Ms. Brown about it (7 RR 34, 35, 36, 37) and emphasized it during final argument, with a not-too-veiled implication that the gun in the picture was the one used in the robbery – though there was never any evidence to support that -- (7 RR 50, 52) Appellant's rights to a lesser sentence or even probation would not have been so substantially injured. *See, Barshaw v. State*, 342

53

S.W.3d 91, 93-94 (Tex. Crim. App. 2011). The verdict on punishment should be reversed and remanded for a new trial on punishment.

**FIFTH ISSUE, RESTATED**

**THE TRIAL COURT REVERSIBLY ERRED IN ALLOWING INTO EVIDENCE A 911 AUDIO THAT HAD NOT BEEN DISCLOSED TO APPELLANT PRIOR TO TRIAL**

Late in the trial the State, without prior notice to Appellant, produced the audio of Ms. Alford's call to 911. Appellant objected, but the audio came into evidence as State's Exhibit #102 (above, Brief, pp. 24-25; 7 RR 58-61). There are local rules in the trial court concerning pre-trial discovery, MNT exhibit #1.

This situation is governed by principles stated in *Oprean v. State*, 201 S.W.3d 724, 726 (Tex. Crim. App. 2006): "Evidence willfully withheld from disclosure under a discovery order should be excluded from evidence. When reviewing a trial judge's decision to admit or exclude evidence, an appellate court must determine whether the judge's decision was an abuse of discretion. Unless the trial judge's decision was outside the "zone of reasonable disagreement," an appellate court should uphold the ruling. When a trial judge makes findings of fact based on an evaluation of credibility and demeanor, an appellate court should show almost total deference to those findings. And when the trial judge fails to enter written or oral findings of fact, an appellate court will view the evidence in the light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact

54

that support its ruling as long as those findings are supported by the record." (citations omitted). The line of inquiry is whether or not the prosecutor was "willfull" and one must consider: (1) did the prosecutor intend to harm the defense; (2) were his/her actions a strategic and purposeful effort to thwart defense's preparation of its case; (3) did the prosecutor consciously decide to violate the plain directive of the discovery order; (4 ) what was the prosecutor's rationale and explanation for violating the discovery order; and (5) did he/she suddenly discover the evidence such that compliance with the terms of the discovery order was impossible. *Walker v. State,* 321 S.W.3d 18, 22 (Tex. App. – Houston [1st Dict.] 2009, pet. dism'd) (citations omitted).

Here, there was a standing order for discovery to be completed before jury selection, Number 6: that the State disclose to Appellant the items "which are in the custody and control of the state or any of the State's agents as a result of the investigation which resulted in charges being brought and which are material evidence in this case to the Defendant's guilt or innocence…" (MNT Ex. #1, p. 2).

The State did not disclose the 911 audio prior to jury selection. So it was in violation of the pre-trial order. Excuse? State argues that it did not anticipate that Ms. Alford would be so thoroughly examined on when she contacted the police (5 RR 60,

55

lines 6-11). Appellant responded that he made this a point because he had no knowledge that she had called the police at an earlier time and date (7 RR 60, lines 12-15). Though Alford says in a video statement that she called the police after she heard a radio report – a video in possession of Appellant – counsel for Appellant said he had nothing to confirm the truth of that; and had he had the 911 audio, he would have structured his cross-examination differently, and not knowing it and not having the 911 audio "…prejudices the defendant and makes it inappropriate to letting it in (5 RR 60-61).

The State never says that it was ignorant of the 911 call; it only says that it had not anticipated a certain line of questioning of the witness. That makes no difference and, as counsel stated, it prejudiced him in presenting his case. So there was intent -- "willfulness" -- on the part of the State to withhold the 911 audio. This amounts to consciously failing to disclose evidence that was material to the State's case. This is a Fourteenth Amendment due process right – the right to notice and discovery. *See, Walker*, 321 S.W.3d at 23. Thus, the error is reviewable as a constitutional error under Rule 44.2(a), TEX. R. APP. PRO. The 911 audio served to reinforce the credibility of the linch-pin witness for the State, who had testified on many aspects of its case, including timing and Appellant's demeanor at the Gold Rush. One cannot say beyond a reasonable doubt that the audio did not contribute to the conviction of

56

Appellant. It was reversible, harmful error. The case should be reversed and remanded for a new trial.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, CORDERO BROWN requests that this Honorable Court of Appeals, upon consideration of  the facts and law, presented, reverse and remand this cause for a new trial, or, alternatively, for an acquittal, and for such other and further relief to which Appellant is justly entitled.

/S/ Hough-Lewis ("Lew") Dunn

Attorney at Law
201 E. Methvin, Suite 102
P.O. Box 2226
Longview, TX 75606
Tel. 903-757-6711
Fax 903-757-6712
Email: dunn@texramp.net
Counsel for Appellant

57

**CERTIFICATE OF DELIVERY**

I hereby certify that a true and correct copy of this Brief for Appellant was sent by email transmission to counsel for the State of Texas, Ms. Zan Colson Brown, at her email address at zan.brown@co.gregg.tx.us on this 20th of February, 2015.

/S/ Hough-Lewis ("Lew") Dunn
Counsel for Appellant

**CERTIFICATE OF COMPLIANCE**

I certify that the foregoing document complies with Rule 9, TEX. R. APP. PROC., regarding length of documents, in that exclusive of caption, identity of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, issues presented, statement of jurisdiction, statement of procedural history, signature, proof of service, certification, certificate of compliance, and appendix, it consists of 14,909 words.

/s/ Hough-Lewis ("Lew") Dunn
Hough-Lewis ("Lew") Dunn